### THE GRANADA.

### No. 143.

District Court, E. D. Pennsylvania.

Dec. 4, 1940.

Allan D. Jones, of Washington, D. C., J. Barton Rettew, Jr., Asst. U. S. Atty.,

and J. Cullen Ganey, U. S. Atty., both of Philadelphia, Pa., for the government.

Joseph W. Henderson and Rawle & Henderson, all of Philadelphia, Pa., for respondent.

BARD, District Judge.

The United States filed a libel against the Honduran Steamship Granada, alleging violation of Section 8 of the Act of Congress of June 19, 1886, as amended February 17, 1898, 46 U.S.C.A. § 289, which reads: "No foreign vessel shall transport passengers between ports or places in the United States, either directly or by way of a foreign port, under a penalty of $200 for each passenger so transported and landed."

A stipulation was filed to the effect that liability should be determined by the court upon all of the facts as pleaded in the answer filed, which are not disputed.

The vessel Granada was one of Honduran registry and was operated by the Standard Fruit and Steamship Company under a demise charter from the Standard Navigation Company. The principal business of the operator is importation of bananas from the tropics. Various of the ships operated, including the Granada, accommodate a limited number of passengers who are carried as tropical cruise passengers incident to the main business of the company.

The Granada, on or about September 9, 1938, sailed from New York with eleven cruise passengers. The foreign destination was Mexico, and the cruise tickets called for a voyage from New York to Mexico and return to New York. At Mexico a cargo was taken on and the ship proceeded homeward. The custom and plan was to return to the United States port of clearance with both the cargo and the passengers, as provided in the cruise tickets. However, to meet the exigencies of the commerce in bananas, to get the bananas into a port for sale while in saleable condition, the ship put in at Philadelphia and the cargo and passengers were discharged there. The railroad fare to New York was given to the passengers, they desiring to return to that place. The cost of sailing the Granada to New York far exceeds the cost of affording the passengers railroad fare.

The avowed purpose insofar as the passengers were concerned was the provision of a cruise voyage according to the tickets sold. It is with this that the court is concerned.

It was stipulated by the United States and the Standard Fruit and Steamship Company, as operator of the vessels Yoro and Gatun, fined for similar transportation, that the determination of the question of liability of the Granada should govern in regard to the other ships.

The company avers that it is not subject to fine because it was not engaged in domestic, coastwise or other commerce between United States ports and because its plan and intent was to provide a cruise from and return to New York.

The respondent admittedly transported passengers between United States ports by way of a foreign port. The United States contends this is clearly within the language of the statute. The language is unequivocal. I recognize, as the United States urges, that ordinarily I am restrained in such a case from construing the statute. However, even a cursory consideration of the possible factual circumstances indicates that there must be a line of demarcation—a point at which the statute is not applicable despite presence of the apparent requisites. For example: "If one should take passage on a vessel at New York for Liverpool, and after transacting business in that city should again take passage on the same vessel on its return voyage and be landed in Boston, it certainly would not be insisted that the vessel would be subject to the penalty imposed by the statute; * * *." 28 Op.Atty.Gen. 204, 208. That the scope of the enactment is limited is further indicated by the decision of the cited opinion, to the effect that a vessel carrying passengers on a world cruise from New York did not violate the act by landing them at San Francisco. It is apparent, therefore, that an inquiry into the policy Congress sought to further by this enactment is in order.

The legislative history of the enactment indicates that it was designed to protect our coastwise and domestic shipping. The first enactment relative to passenger traffic came some time after the Congress took legislative steps to safeguard the domestic commerce in merchandise, to restrict the transportation of freight in coastwise traffic by vessels not owned by citizens of the United States.

894

The original enactment concerning transportation of passengers, the Act of June 19, 1886, c. 421, sec. 8, 24 Stat. 81, imposed a fine of $2 for every passenger carried between United States ports on a foreign vessel. Shortly thereafter, by the Act of February 17, 1898, c. 26, sec. 2, 30 Stat. 248, 46 U.S.C.A. § 289, this was amended to make it unlawful to transport passengers from one United States port to another either directly or by way of a foreign port, and to increase the penalty to $200 per passenger so carried. The aim of the amending enactment can well be inferred. In view of the great increase in penalty and the provision that indirect as well as direct transportation should warrant a fine, it can be inferred that the Congress sought to meet the increasing threats to the practical monopoly of coastwise and domestic shipping which was to be preserved for United States ships.

The various Attorneys General of the United States have interpreted the act several times in the course of its administration. A fair summary of their interpretations is that the design of Congress was to exclude ships of foreign registry from carrying on coastwise or other domestic traffic by direct or indirect carriage of passengers from one United States port to another.

The question then is, whether the transportation in this instance comes within the spirit as well as the letter of the law. Particular opinions of the Attorneys General furnish some guidance in this respect.

It has been declared violative of the act to transport passengers from Philadelphia to Boston for a convention and return by way of foreign ports, with stopover privileges, where the primary purpose was deemed to have been transportation to the convention in Boston. 34 Op. Atty.Gen. 340. Likewise, it has been declared a violation to transport passengers from an insular possession of the United States to a United States port. 30 Op.Atty. Gen. 44.

It has been declared not to be a violation of the act to transport passengers from New York to San Francisco, when the discharge at San Francisco followed an extended world cruise and was deemed incidental thereto. The Cleveland, 28 Op. Atty.Gen. 204. It is largely on the basis of this opinion that the instant fine is objected to.

Referring to this opinion, Attorney General Wickersham in a later opinion, 29 Op.Atty.Gen. 318, 322, said: "In the case of the Cleveland the transportation came within the letter of the statute, since the tourists were actually transported from one port in the United States to another port therein, via a foreign port or ports. But that case was held not to be within the spirit of the statute, because the real object of the voyage was the trip around the world."

The object in the transportation of the passengers on the Granada was to afford them a cruise to a foreign port, not to engage in commerce between United States ports. The contract called for a voyage from New York to a foreign port and return to New York. That it was neither the aim nor the desire of the passengers to be transported to Philadelphia is evidenced by their immediate entrainment for New York upon being discharged at Philadelphia.

It is, of course, an inescapable fact that the Granada, a foreign vessel, carried passengers from New York to Philadelphia by way of a foreign port. However, I cannot see how this transportation was detrimental to the coastwise monopoly sought to be assured to United States vessels. Nor can I see how this transportation fits within the spirit of the act as reasonably interpreted.

The fear has been voiced that a decision favorable to the Granada will provide a basis for the gradual erection of a commercial structure sought to be excluded by the act. I recognize this danger, but declare that, if related to the pertinent facts, this decision can not be utilized to support evasions of the act.

The libel should be dismissed.

So ordered.