**AUTOLOG CORPORATION et al.**

**Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO, Appellant,**

v.

**Donald T. REGAN et al.**

**AUTOLOG CORPORATION et al.**

**Trailer Marine Transport Corporation and Drummond Lighterage Company, Appellants,**

v.

**Donald T. REGAN et al.**

**AUTOLOG CORPORATION et al.**

**Acadian Shipping Corporation, Appellant,**

v.

**Donald T. REGAN et al.**

**Nos. 83–1470, 83–1477 and 83–1497.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 16, 1984.

Decided March 30, 1984.

James Altman, Washington, D.C., for Seafarers International Union of North America, appellant in No. 83–1470. David Jaffe, New York City, was on the brief for appellant in No. 83–1470.

Leonard H. Dickstein, Washington, D.C., with whom Michael Joseph, Thomas L. Mills, and Donald M. Squires, Washington, D.C., were on the brief, for Trailer Marine Transport Corp., et al., appellants in No. 83–1477.

A. Patricia Frohman, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, and Royce C. Lamberth and L. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for the federal appellees.

J. Michael Cavanaugh, Washington, D.C., with whom Eliot J. Halperin and Gary W. Christian, Washington, D.C., were on brief, for appellee Scandinavian World Cruises (Bahamas) Limited.

Before WRIGHT, WILKEY, and MIKVA, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

This case involves a challenge under Sections 289 and 883 of the coastwise shipping laws, 46 U.S.C. §§ 289, 883 (1976 & Supp. V 1981), to the legality of certain shipping services provided by a foreign-flag water carrier. Section 289 bars foreign-flag vessels from transporting passengers between United States ports either directly or by way of a foreign port. Section 883 presents a similar bar to foreign-flag transport of merchandise between American ports. A group of plaintiffs comprising land carriers, U.S.-flag water carriers, and

the Seafarers International Union sought an injunction prohibiting Scandinavian World Cruises, Ltd. (SWC) from transporting passengers and their automobiles from New York to Florida by way of the foreign port of Freeport, Grand Bahama. The District Court denied the requested relief. The court found that none of the plaintiffs had standing to bring the Section 289 claim and that only the water carriers and the union had standing to bring the Section 883 claim. On the merits of the Section 883 claim the court ruled that the challenged transportation did not violate the prohibition of foreign-flag shipment of "merchandise" because passengers' automobiles were not merchandise within the meaning of the statute, but were accompanying baggage. *See Memorandum Opinion*, March 8, 1983 (Mem.Op.), Joint Appendix (JA) 49.

While we agree with most of the District Court opinion, we think the court improperly denied the union standing to bring a claim under Section 289. Because we find the union has standing under this section, we address the merits of this claim as well as the claim under Section 883 and we find that the foreign-flag service challenged in this case violates neither section. We therefore affirm the District Court's conclusion that SWC's service should not be enjoined.

## I. BACKGROUND

Scandinavian World Cruises, Ltd. (SWC), a corporation organized under the laws of the Bahamas, has since October 1, 1982 operated three Bahamian-flag vessels in the Atlantic trade. One vessel operates between New York and Freeport, Grand Bahama. The other two make daily voyages between Freeport and Florida (one to Miami and the other to Port Canaveral). All three vessels carry both passengers and automobiles. Passengers pay the same price whether or not they bring their automobiles. Automobiles are treated as baggage; passengers simply drive them onto the vessels and have access to them throughout the voyage.

Though SWC does not provide direct service from New York to Florida, it does advertise a New York to Florida cruise. On July 25, 1982 SWC ran an advertisement in the New York Times that read: "Cruise to Florida for less than it costs to drive." *Federal Defendants' Statement Of Material Facts As To Which There Is No Genuine Issue* ¶ 4, JA 25. Passengers desiring this service travel from New York to Freeport in one SWC vessel, disembark and clear customs, and then transfer to another SWC vessel for the trip from Freeport to Florida. Ninety-eight percent of the SWC passengers leaving New York with automobiles during the period October 30, 1982 to December 30, 1982 had reservations to continue to Florida with SWC, and 90 percent of this group spent less than 48 hours in Freeport. Similarly, 75 percent of all SWC passengers—those with automobiles and those without—who booked a New York to Freeport trip had advance reservations to continue to Florida on an SWC vessel. Ninety percent of these through-travellers spent less than 48 hours in Freeport, most less than 24 hours. *See Intervening Plaintiffs' Statement Of Material Facts As To Which There Is No Genuine Issue*, Tables 1 & 2, JA 35–36.

This litigation commenced in the summer of 1982. In response to SWC's advertisement in the New York Times on July 25th, several interstate truck and rail carriers of automobiles (the land carriers) [1] sought declaratory and injunctive relief requiring the Secretary of the Treasury to prohibit SWC's proposed service on the ground that it violated the coastwise laws. SWC was also named as a defendant. Three water carriers planning to enter the Atlantic coast trade—Trailer Marine Transport Company, Drummond Lighterage Company, and Acadian Shipping Corporation (the water carriers)—intervened as plaintiffs. The Seafarers International Union, which

---

**1.** The land carrier plaintiffs are: Autolog Corporation, American Auto Shippers, Inc., Dependable Car Travel Service, Inc., and Auto Express, Inc.

represents seamen crewing U.S.-flag vessels, also intervened.

The gravamen of plaintiffs' complaint was that SWC's indirect New York to Florida service impermissibly infringed the coastwise monopoly guaranteed to American vessels under Sections 289 and 883 of Title 46 of the United States Code. Section 289 states: "No foreign vessel shall transport passengers between ports or places in the United States, either directly or by way of a foreign port * * *." 46 U.S.C. § 289 (1976). Section 883 states: "No merchandise shall be transported by water, or by land and water, * * * between points in the United States, * * * either directly or via a foreign port, or for any part of the transportation, in any other vessel than a vessel built in and documented under the laws of the United States * * *." *Id.* § 883 (Supp. V 1981). These statutory sections are bulwarks of a legal structure that guarantees a coastwide monopoly to American shipping and thereby promotes development of the American merchant marine.

The District Court denied plaintiffs' motion for a preliminary injunction prohibiting SWC's service. *Findings of Fact and Conclusions of Law*, September 21, 1982, JA 11. Both plaintiffs and defendants then moved for summary judgment, and on March 8, 1983 the District Court entered summary judgment for defendants. The court found that no plaintiff had standing to bring a challenge based on Section 289 and that only the water carriers and the union had standing to bring a challenge based on Section 883. On the merits the court held that SWC's service did not violate Section 883 because the automobiles shipped were not "merchandise" within the meaning of the statutory term, but were merely the accompanied baggage of passengers. Mem.Op., JA 49. The water carriers and the union then appealed to this court.

## II. ANALYSIS

We agree with the District Court's result and with much of its reasoning. Our analysis differs from that of the District Court with respect to the union's standing, however, and this difference requires us to reach the issue that the District Court found no need to reach: whether SWC's indirect New York to Florida service violates Section 289. We hold that it does not and therefore affirm the District Court's decision that SWC's service does not violate the coastwide laws. *See Langnes v. Green*, 282 U.S. 531, 538–539, 51 S.Ct. 243, 246, 75 L.Ed. 520 (1931) (federal appellate court may affirm the judgment appealed from on grounds different from those offered by the rendering court). We will first explore the standing issues and then proceed to the merits of the Section 289 and Section 883 claims.

### A. *Standing*

*Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), contains the Supreme Court's most recent reformulation of standing principles. The opinion reaffirmed that the law of standing places both constitutional and prudential limits on a litigant's right to invoke the adjudicatory power of the federal courts. As an irreducible constitutional minimum, the Court held:

Art. III requires the party who invokes the court's authority to "show [1] that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," * * * [2] that the injury "fairly can be traced to the challenged action" and [3] "is likely to be redressed by a favorable decision" * * *. * * *

*Id.* at 472, 102 S.Ct. at 758 (citations omitted). The court also restated the complementary prudential limits on standing, the most important of which for our purposes here is the requirement that a party seeking redress for a statutory violation must fall "within 'the zone of interests to be protected or regulated by the statute * * * in question.'" *Id.* at 475, 102 S.Ct. at 760 (*quoting Ass'n of Data Processing Service*

*Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)).

Applying these principles, the District Court found that the motor carriers lacked standing to bring either a Section 289 claim or a Section 883 claim because they met neither the "redressibility" aspect of the constitutional test nor the prudential "zone of interests" test. The court then found that the water carriers met the three-part constitutional test but came within the "zone of interests" only of Section 883. The court limited the water carriers to a Section 883 claim because it found that none of the three was providing or contemplating passenger service between New York and Florida; they planned only to ship automobiles. Implicit in this holding is the view that the interest the water carriers asserted was the right to be free of illegal foreign competition in the coastwise shipment of automobiles. Since Section 289 guaranteed a domestic monopoly for coastwise transportation of *passengers* the court held that these plaintiffs were not seeking protection of an interest within the "zone" of that section. Mem.Op. at 9–11, JA 57–59.

The court likewise held that the union met the constitutional test but fell within the "zone of interests" of only Section 883. Because the union did not "possess any members * * * currently serving as the crews of U.S.-flag vessels engaged in the coastwise trade between New York and Florida," Mem.Op. at 9, JA 57, the court concluded that the union did not independently come within the "zone of interests" of either Section 289 or Section 883. The court found, however, that the union had standing derivative of that of the water carriers because the union was under contract with one of them to crew a vessel that would ship automobiles between New York and Florida. Mem.Op. at 9–11 & n. 6, JA

57–59. Thus the union, like the water carriers, was permitted to assert the Section 883 claim but not the Section 289 claim.

In our judgment the District Court correctly found that the water carriers and the union were within Section 883's zone of interests but erred in finding that the union did not fall within Section 289's zone of interests. Though the prudential "zone" test has been roundly criticized, *see Copper & Brass Fabricators Council, Inc. v. Dep't of the Treasury*, 679 F.2d 951, 953–954 (D.C.Cir.1982) (Ginsburg, J., concurring); 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 24:17 (2d ed. 1983), it remains a firm requirement of the law of this circuit. *See American Friends Service Committee v. Webster*, 720 F.2d 29, 49–52 (D.C.Cir. 1983); *Control Data Corp. v. Baldrige*, 655 F.2d 283 (D.C.Cir.), *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981); *Tax Analysts & Advocates v. Blumenthal*, 566 F.2d 130 (D.C.Cir.1977). We hesitate to criticize the District Court's efforts to understand this most elusive concept, but we think the court construed Section 289's zone of interests too strictly. The union should have been found to be within the zone of interests protected by Section 289 regardless of whether the water carriers were found to be within that zone.

■ As formulated in this circuit, the zone of interests test "requires some indicia—however slight—that the litigant before the court was intended to be protected, benefited or regulated by the statute under which suit is brought." *Copper & Brass Fabricators Council, supra*, 679 F.2d at 952; *accord American Friends Service Committee, supra*, 720 F.2d at 49–59 (zone test requires slight beneficiary indicia).[2] Courts should give broad com-

---

**2.** We echo Judge Ginsburg's expression of concern in *Copper & Brass Fabricators v. Dep't of the Treasury*, 679 F.2d 951, 954–955 (D.C.Cir. 1982), that this circuit's formulation of the zone of interests test in *Control Data Corp. v. Baldrige*, 655 F.2d 283 (D.C.Cir.), *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981), may be unduly narrow in light of the Supreme

Court's definition of the test. In *Control Data* the opinion would seem to have required some indicia of actual congressional intent to protect the interest that the party is asserting, but "the 'zone' test announced by the Supreme Court requires only that the litigant be *'arguably'* within the zone of interests to be protected or regulated by the statute or constitutional guarantee

pass to a statute's "zone of interests" in recognition that this test was originally intended to *expand* the number of litigants able to assert their rights in court. *Accord American Friends Service Committee, supra,* 720 F.2d at 51.

■ In the present case abundant evidence confirms that Congress intended the laws creating a coastwise monopoly for domestic shippers and crews, including Section 289, to protect the livelihood of American seamen, whose interests the union represents. At least 75 percent of those who crew American passenger ships in the coastwise trade must be American citizens. 46 U.S.C. § 672a (1976). Thus in guaranteeing a monopoly for domestic shippers the coastwise laws protect the livelihood of union members.[3] *See Wirth Ltd. v. S/S Acadia Forest,* 537 F.2d 1272, 1281 n. 32 (5th Cir.1976) (clear purpose of ensuring a coastwise monopoly is "to protect and develop American merchant marine, shipbuilding, *seamen,* etc." (emphasis added)); *The Granada,* 35 F.Supp. 892, 894 (E.D.Pa. 1940) (Section 289 grants "coastwise monopoly"). *Cf. generally Marine Carriers Corp. v. Fowler,* 429 F.2d 702, 703 (2d Cir.) ("[T]he United States treats its coastwise shipping trade as a jealously guarded preserve. In order to participate in this trade, a vessel's credentials must be thoroughly American."), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971).

In *Curran v. Laird,* 420 F.2d 122 (D.C. Cir.1969) (*en banc*), this circuit held unequivocally that a union representing American seamen was within the zone of interests of another aspect of the coastwise monopoly laws, the Cargo Preference Act, 10 U.S.C. § 2631, which guarantees domestic monopoly over transport of military cargo. In *Curran* we held that the Cargo Preference Act, when read together with the statutory requirement that American seamen crew American vessels, "reflect[s] sufficient concern for American crews and protection against foreign competition to avoid dismissal of [the] action for lack of standing." *Id.* at 126–127. The analogy from *Curran* is compelling. Like the Cargo Preference Act, Section 289 guarantees domestic monopoly over an aspect of coastwise shipping. When read together with the requirement that Americans crew American ships, Section 289 also reflects "sufficient concern for American crews and protection against foreign competition * * *." *Id.* The union represents the seamen whose livelihood Section 289 is meant to protect. Thus the union must be found to be within Section 289's zone of interests.

Though the District Court's zone of interests analysis was flawed, the court's concern over the fact that no union members crewed any Atlantic coastwide passenger ships in the New York to Florida trade implicitly raises legitimate issues that should have been resolved under the standing tests for constitutionally sufficient injury. The District Court appears to have read the union's complaint as alleging a loss of *present* jobs and wages as a consequence of SWC's putatively illegal service. If so the union should probably have been found to lack constitutionally sufficient standing since it has not alleged that its members crew or are about to crew competing ships in the Atlantic coastwise passenger trade and thus SWC's service poses

in question.'" *Copper & Brass Fabricators, supra,* 679 F.2d at 954 (*quoting Ass'n of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) (emphasis by the *Copper & Brass* court)). In any event we need not resolve the issue here because we find that the union falls within even the narrower *Control Data* definition of the zone of interest of § 289.

**3.** In *Tax Analysts & Advocates v. Blumenthal,* 566 F.2d 130 (D.C.Cir.1977), the court urged caution in looking to statutory provisions other than the one at issue when deciding whether a

litigant falls within the zone of interests of the applicable provision. The court properly noted that other provisions might "embody *different* goals and policies." *Id.* at 141 (emphasis in original). In the present case, however, we find analogous provisions of the coastwise monopoly laws illuminative of the interests that § 289 was intended to protect. These statutory provisions function together to ensure the American monopoly over all aspects of coastwise shipping, and one crucial purpose of this monopoly is protection and development of American crews.

no threat to the current employment of union members. We find, however, that the union's complaint is most fairly read as asserting not a loss of present jobs but a loss of employment opportunity. The union alleges that SWC's capture of the market for New York to Florida shipment of passengers and their automobiles has injured union members because U.S.-flag vessels, with union crews, would be supplying this service but for SWC's current service.

■ Such injury is far greater than the "identifiable trifle" sufficient to meet the "actual or threatened injury" aspect of the constitutional test. *See Public Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708, 714 (D.C.Cir.1977), *citing SCRAP v. United States*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973) (*quoting* Davis, *Standing: Taxpayers and Others*, 35 U.Chi.L.Rev. 601, 613 (1968)). Nor does the union's allegation fail the "causation" or "redressibility" aspects of the constitutional test. The alleged harm, though indirect, is far from the kind of tenuous speculation we have found insufficient to confer standing in cases such as *Public Citizen, supra.* It is well settled that a plaintiff has standing to challenge conduct that indirectly results in injury, *see SCRAP v. United States, supra*, 412 U.S. at 688, 93 S.Ct. at 2416, as long as the injury is fairly traceable to the challenged conduct. As the court in *Public Citizen, supra,* noted, "We are concerned here not with the length of the chain of causation, but on [*sic*] the plausibility of the links that comprise the chain." 565 F.2d at 717 n. 31.

In the present case the chain consists of only one connecting link and it is this: absent SWC's service, domestic carriers would move in to meet the heavy demand for New York to Florida transport of passengers and automobiles. Given that SWC has captured the market for what appears to be a booming trade and that competitors are already preparing to enter the market for automobile shipment, we find it most plausible that U.S.-flag carriers, with crew positions for union members to fill, would move in to capture the passenger market if SWC were precluded from continuing its service. Indeed, the premise that exclusion of foreign-flag shippers will prompt domestic shippers to exploit existing markets for coastwise shipping undergirds the structure of the coastwise laws; we must give great weight to this congressional finding in our standing inquiry. Similarly, though we do not know to a certainty that the requested relief would ensure future jobs for union members by drawing U.S.-flag carriers into the New York to Florida passenger trade, we find such a result highly likely. *See Valley Forge Christian College, supra*, 454 U.S. at 472, 102 S.Ct. at 758 (requiring that requested relief be *likely*, but not certain, to alleviate harm complained of); *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976) (same).

Because we have found that the union has standing to assert both the Section 289 claim and the Section 883 claim, we will proceed to the merits of those claims without deciding whether the District Court properly denied standing to the water carriers under Section 289.[4]

B. *The Alleged Violations of the Coastwise Laws*

■ 1. *Section 289.* Section 289 prohibits any "foreign vessel" from transporting passengers between United States ports "either directly or by way of a foreign port." 46 U.S.C. § 289. At first blush SWC's service would seem to fall within the range of activity that Section 289 proscribes. Most passengers on SWC's foreign-flag vessels are traveling from New York to Florida by way of a foreign port. Were we writing on a *tabula rasa* we might well agree with appellants that SWC's conduct amounts to an invasion of Section 289's guarantee of domestic monopoly. Contrary agency interpretation of

---

**4.** The land carriers did not appeal the District Court decision. We thus express no opinion on whether the court properly denied standing to this group of plaintiffs.

Section 289 and strong indicia that this interpretation reflects the specific intent of Congress constrain us, however.

In a letter ruling the United States Customs Service (Customs) specifically approved SWC's proposed indirect New York to Florida passenger service. Interpreting Section 289, Customs stated: "The transportation of passengers between ports in the United States either directly or by way of a foreign port, as contemplated by the statute, includes only those cases where but one foreign vessel is involved in the continuous transportation." *Customs Ruling 103340* (1978) at 1–2, JA 83–84. Since SWC uses two vessels to provide its indirect New York to Florida service, Customs found no violation of Section 289. The agency's ruling in this case accords with consistent Customs interpretation of Section 289. *See Customs Ruling 100636* (1973), JA 82 ("In view of the fact that the passengers [on a Maine to Nova Scotia to Florida service] are not transported by a foreign vessel between two ports in the United States, two separate vessels being used with the transfer of the passengers in a foreign country, no violation of section 289 * * * will occur."); *Customs Ruling of July 1, 1954* (unnumbered), JA 80. In short, Section 289, as interpreted by Customs, aims at the route of the *vessel*, not the route of the passengers.

We have some trouble seeing how a focus on the route of the vessel rather than the route of the passengers better advances the congressional purpose of assuring domestic monopoly over coastwise transportation of passengers. And even if we are bound to give deference to this agency interpretation of its governing statute, we can of course overturn that interpretation if we find that it is "inconsistent with a statutory mandate or * * * frustrate[s] the congressional policy underlying a statute." *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). Two indicia of congressional intent lead us to conclude, however, that Cus-

toms' interpretation is not only consistent with the statutory scheme but also accurately embodies Congress' *specific* intent that Section 289 not prohibit the type of indirect service challenged here.

First, Congress has acquiesced in Customs' interpretation for almost a century [5] and has not acted to change it during several revisions of the coastwise laws. When an agency interpretation has been officially published and consistently followed, "Congress is presumed to be aware of [the] administrative * * * interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change[.]" *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n. 66, 102 S.Ct. 1825, 1841 n. 66, 72 L.Ed.2d 182 (1982). Second, the legislative history of an attempt to amend Section 289 in 1920 indicates that Congress did not intend the section to prohibit the type of service at issue in this case. In a 1920 overhaul of the coastwise laws the Senate Commerce Committee reported out a proposed amendment to Section 289 that would have explicitly prohibited indirect foreign-flag passenger transportation functionally identical to the service at issue here: passengers sailed on Canadian-flag ships from Seattle to Victoria, British Columbia, and transferred there to another Canadian-flag vessel for the trip from Victoria to Alaska. *See* S.Rep. No. 573, 66th Cong., 2d Sess. 18 (1920). After consideration on the floor, 59 Cong.Rec. 7348 (1920) (remarks of Sen. Jones in favor); *id.* at 7350 (remarks of Sens. McCumber and Nelson in opposition), the Senate rejected the proposed amendment. In light of these indicia of congressional intent that indirect service involving more than one foreign-flag vessel does not violate Section 289, we hold that SWC's passenger service is not prohibited by the coastwise laws.

■ 2. *Section 883.* In *Customs Ruling 103340* Customs approved SWC's proposals for both passenger transport and automobile transport. The ruling stated

**5.** This interpretation was first advanced in an opinion of the Attorney General, 18 Op. Att'y Gen. 444, 446–447 (1886), and was reiterated in 36 Op. Att'y Gen. 352, 354 (1930).

that "automobiles accompanying passengers on a movement not in violation of section 289 would be deemed to be accompanying baggage of passengers and not merchandise within the meaning of Section 883." *Customs Ruling 103440* at 2, JA 84. Given that SWC's passenger service does not violate Section 289, we cannot say that the transport of automobiles belonging to passengers violates Section 883. Customs has long treated automobiles accompanying passengers as baggage, not merchandise, *see Customs Ruling 104112* (1979), JA 85, and rulings cited therein. This interpretation reflects the basic international understanding that "luggage" is "any article or *vehicle*" except those carried under a bill of lading "or other contract primarily concerned with the carriage of goods." *Convention Relating to the Carriage of Passengers and Their Luggage by Sea,*" signed at Athens on December 13, 1974, IMCO No. 75.03E, *reprinted in* 6 A.W. & C.R. Knauth, *Benedict on Admiralty*, Doc. 2–2 (7th ed. 1982). Most importantly, we find this interpretation consistent with the congressional intent behind Section 883. In Section 883 Congress aimed at ensuring domestic monopoly for the coastwise shipment of *goods*. Though SWC transports many automobiles to Florida, the point of the shipment is to provide a *service* to passengers; they pay the same price whether or not they bring their automobiles. And SWC does not ship automobiles unaccompanied by passengers. Having found that SWC's passenger service does not violate Section 289, we find no reason for holding that the shipment of accompanying automobiles independently violates Section 883. We thus affirm the District Court ruling that this service does not violate Section 883.

### III. Conclusion

Though we have some doubts about Customs' decision to permit SWC's indirect New York to Florida service, we defer to this decision because it accords with the indicia of congressional intent we have been able to find. If we have erred in reading Sections 289 and 883 as permitting SWC's indirect coastwise service, we expect that Congress will rouse from its long acquiescence in that interpretation and so instruct us. Absent such instruction we adhere to the current understanding that the coastwise laws do not prohibit foreign-flag transport of passengers and automobiles between two domestic ports as long as more than one vessel is used in the transport. We therefore affirm the District Court.

*Affirmed.*