### INTERNATIONAL UNION OF BRICK-LAYERS AND ALLIED CRAFTSMEN, et al., Appellants,

v.

### Edwin MEESE III, Attorney General of the United States, et al.

No. 84–5339.

United States Court of Appeals, District of Columbia Circuit.

Argued March 18, 1985.

Decided May 17, 1985.

Seymour M. Waldman, New York City, with whom George Kaufmann and Barry W. Levine, Washington, D.C., were on the brief, for appellants.

Mary Reed, Atty., Dept. of Justice, of the Bar of the Supreme Court of Nevada, pro hac vice by special leave of the Court, with whom Richard K. Willard, Acting Asst. Atty. Gen., and Thomas W. Hussey, Asst. Director, Office of Immigration Litigation, Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before WALD, EDWARDS and DAVIS *, Circuit Judges.

Opinion for the Court filed by Circuit Judge DAVIS.

DAVIS, Circuit Judge:

Appellants, plaintiffs below, are an international union representing bricklayers and other construction craftsmen, a local union (within the international) representing such workers in Pennsylvania, and three members of the local. They brought suit in the district court (against the Attorney General, the Secretary of State, and the Immigration and Naturalization Service (INS)) seeking a declaration that certain internal guidelines promulgated by the INS are unlawful, as well as injunctive relief prohibiting continued application of these guidelines by the Department of Justice and the State Department. The district court, Pratt, J., dismissed the complaint for lack of jurisdiction, lack of standing on the part of appellants, and mootness. We reverse and remand for further proceedings consistent with this opinion.

I.

Section 221(a)(2) of the Immigration and Nationality Act, as amended (the Act), 8 U.S.C. § 1201(a)(2) (1982), provides for the issuance of entry visas to nonimmigrant aliens who fit into one of the categories specified in § 101(a)(15) of the Act, 8 U.S.C. § 1101(a)(15). For the purposes of this case, two of those categories are relevant. The first, which entitles the entering alien to a "B–1" classification, includes:

---

* Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a).

an alien [with exceptions not relevant here] having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business.

8 U.S.C. § 1101(a)(15)(B). The second, which entitles the entering alien to an "H–2" classification, is for:

an alien having a residence in a foreign country which he has no intention of abandoning ... (ii) who is coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country.

8 U.S.C. § 1101(a)(15)(H). Corresponding to § 101(a)(15)(H)(ii), *supra*, § 212(a)(14) prohibits entry by aliens

for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that (A) there are not sufficient workers who are able, willing, qualified, ... and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.

8 U.S.C. § 1182(a)(14); *see* 8 C.F.R. § 212.8 (1984) (INS regulations concerning procedures for processing applications for H–2 entry).

In order to ease the administrative difficulties associated with entries into this country, the INS maintains internal agency guidelines, called "Operations Instructions" or "OI's," dealing with the proper procedure under the Act in various situations. At issue here is § 214.2(b) of these Operations Instructions, which provides:

Each of the following may also be classified as a B–1 nonimmigrant [under § 101(a)(15)(B) of the Act] if he/she is to receive no salary or other remuneration from a United States source (other than an expense allowance or other reimbursement for expenses incidental to the temporary stay).

\* \* \* \* \* \*

(5) An alien coming to install, service, or repair commercial or industrial equipment or machinery purchased from a company outside the U.S. or to train U.S. workers to perform such service, provided: the contract of sale specifically requires the seller to perform such services or training, the alien possesses specialized knowledge essential to the seller's contractual obligation to provide services or training, the alien will receive no remuneration from a U.S. source, and the trip is to take place within the first year following the purchase.

Appellants charge that, pursuant to this Operations Instruction, the State Department (which follows § 214.2(b) of the Operations Instructions) has issued visas to, and INS has allowed entry of, certain aliens without the procedures required by (and therefore in violation of) §§ 101(a)(15)(H)(ii) and 212(a)(14) of the Act. In their complaint, appellants alleged that the B–1 visas were issued to a group of Italian nationals for the purpose of installing a prefabricated sawmill in Kane, Pennsylvania—and that those aliens were admitted into the country. The allegations are that, during the period in which the Italians constructed the sawmills, the individual appellants and other members of the local and international unions were ready, willing and able to perform the work on the mill. The sawmill was completed in June 1983 and the Italians left on July 4 of that year.

During the course of proceedings in the trial court, appellants discovered that in 1977 B–1 visas were issued to, and entry was allowed of a group of West German bricklayers who came to the United States to construct large furnaces in Theodore, Alabama. The parties disagree as to whether other instances of entry under the

Operations Instruction have occurred.[1] The parties did, however, present sufficient evidence for making the jurisdictional and standing determinations required in this case.

The district court ordered the complaint dismissed on three grounds. First, the court briefly suggested that it lacked subject matter jurisdiction because appellants' complaint draws into question the discretionary determinations of consular officials. Second, the court found that appellants lacked standing to bring this action because they failed to demonstrate that aliens would deprive them of masonry jobs in the future. The court characterized appellants' complaints as requesting an advisory opinion regarding the legality of the INS Operations Instruction. Third, the court held that the case was moot, since the appellants filed suit after the work at the Kane sawmill was complete. We consider each of these points in order.[2]

## II.

■ The district court relied primarily on the authority of *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) and *Wan Shih Hsieh v. Kiley,* 569 F.2d 1179 (2d Cir.), *cert. denied sub nom. Wan Shih Hsieh v. INS,* 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 121 (1978), for its conclusion regarding subject matter jurisdiction. Each of those cases concerned challenges to a decision by a consular officer on a particular visa application. In this situation, the Supreme Court said:

> The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial inter-

vention, is settled by our previous adjudications.

*Kliendienst v. Mandel,* 408 U.S. at 766, 92 S.Ct. at 2583 (quoting *Lem Moon Sing v. United States,* 158 U.S. 538, 547, 15 S.Ct. 967, 970, 39 L.Ed. 1082 (1895)). This proposition has no application here because appellants do not challenge a particular determination in a particular case of matters which Congress has left to executive discretion. Rather, they charge that the general Operations Instruction promulgated by the INS violates the pattern set forth in §§ 101(a)(15)(H) and 212(a)(14) of the Act as to the proper manner by which nonimmigrant aliens shall be admitted to perform labor. The federal courts have jurisdiction over this type of case to assure that the executive departments abide by the legislatively mandated procedures. *See, e.g., Narenji v. Civiletti,* 199 U.S.App.D.C. 166, 617 F.2d 745 (1979)(judicial review of INS regulation), *cert. denied sub nom. Confederation of Iranian Students v. Civiletti,* 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980); *Castaneda-Gonzalez v. INS,* 183 U.S.App.D.C. 396, 564 F.2d 417, 428 n. 25 (1977) ("The fact that an erroneous administrative interpretation of the law in one context [*i.e.,* when made by consular officials] is not correctable by the courts because it is unreviewable is no reason for the courts to adopt it as the governing standard for administrative action which is reviewable"); *North American Industries v. Feldman,* 722 F.2d 893 (1st Cir.1983) (federal courts may review an INS Operations Instruction to determine whether it is consistent with the Act). Thus, the district court erred in suggesting it lacked subject matter jurisdiction.

## III.

■ Even if a federal court has subject matter jurisdiction over an issue raised

---

1. Discovery in this case was somewhat shortened.

2. While this appeal was pending, the international union became aware of a project in Lake County, California, in which West German bricklayers holding B–1 visas were performing work of which the union's members were allegedly capable and for which they were presumably available. The union filed suit in the district court in California, which issued a preliminary injunction ordering the INS to change the aliens' visas from B–1 "visitor for business" status to B–2 "visitor for pleasure" status. *International Union of Bricklayers and Allied Craftsmen, et al. v. Smith, et al.,* No. C–85–1253 CAL (N.D.Cal. March 1, 1985).

in a complaint, the suit may not constitute a "case" or "controversy" over which that court can exercise its power under Article III of the Constitution. A prime element of the "case" or "controversy" requirement is that the plaintiff have standing to complain of the acts alleged and to seek the relief requested. The constitutional aspect of standing requires that the plaintiff actually have been injured or threatened with injury by the conduct set forth in the complaint, that the injury be "fairly traceable" to the challenged action, and that a favorable decision will "likely" provide redress. *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citing *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976)).

■ In addition to this constitutional minimum, the courts have imposed additional standing demands in light of concerns about the proper judicial role in the constitutional scheme. Federal courts abjure consideration of vague and generalized grievances which are more properly the domain of the political branches of the government. *Valley Forge*, 454 U.S. at 473–74, 102 S.Ct. at 759–60. In order to confine federal courts to the consideration only of concrete issues amenable to judicial resolution, a party must link the particular right asserted with the particular constitutional provision, statute or regulation under which the suit is brought. This requirement has been embodied in the rule that the claimant must fall "within the 'zone of interests to be protected or regulated by the statute or constitutional guarantee in question'." *Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)).

## A.

■ In *Allen v. Wright*, —— U.S. ——, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), the Supreme Court recognized that the formulation of the constitutional requirement of standing is not of a type that lends itself to mathematically precise evaluations. However, the Court noted that "the standing concepts have gained considerable definition from developing case law." 104 S.Ct. at 3325. The Court then recommended that "the standing question ... be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases." *Id.* Our review of "prior standing cases" convinces us that appellants have constitutional standing to bring the current suit.

The first element of standing—injury in fact—goes to the nature of the plaintiff's complaint. Not all that which may befall an individual is amenable to judicial correction; an abstract "injury" will find no relief in federal court. Thus, one may not judicially challenge a governmental action just because one disagrees with it, or even finds it odious, distasteful and offensive. *Allen v. Wright, supra; Valley Forge, supra.*

In this instance, the injury of which appellants complain is not abstract. On the contrary, they allege that, under the guise of B–1 status, the INS is allowing aliens into the country to perform work which would otherwise likely go to union members. They charge that those alien workers represent competition which appellants would not face if the Government followed the procedures required by law. The Supreme Court ruled in *Association of Data Processing Service Orgs., supra,* that such a competitive injury resulting from lost economic opportunities could form the foundation necessary for standing. The Court there held that those who provide data processing services may challenge a regulation which would allow national banks to provide similar services. Similarly, in *Tax Analysts & Advocates v. Blumenthal*, 184 U.S.App.D.C. 238, 566 F.2d 130, 138 (1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), this court ruled that

the owner of an oil well suffered an "injury in fact" as a result of the competition engendered by a statute which granted a tax deduction for oil payments to foreign nations. And in *Autolog Corp. v. Regan*, 235 U.S.App.D.C. 178, 731 F.2d 25 (1984), this court recently recognized the standing of a union to challenge practices which admitted foreign competition. The appellants here have brought a comparable challenge, asserting the loss of employment opportunities to foreign laborers. The allegations in appellants' complaint fit within the holding of the precedents as to "injury in fact."

The constitutional requirement is also that plaintiffs' injury be "fairly" traceable to the conduct complained of and that the injury be remediable by judicial action. This apparently is where the district court found appellants' complaint lacking, because it concluded that appellants failed to demonstrate the likelihood that aliens would deprive them of work in the future. The court referred to appellants' injury as "speculative." We cannot agree. Appellants need not be omniscient and pinpoint precisely when and where the next infraction will occur. The requirement is only that the injury be "fairly" traceable to governmental action and that it is "likely" to be assuaged by judicial resolution. Certainty is not a prerequisite. *Autolog Corp. v. Regan, supra,* 235 U.S.App.D.C. at 184, 731 F.2d at 31.

Appellants cited in the court below two instances in which aliens have been admitted under B–1 visas to perform work of which the union members are said to be capable. They have also brought a third, current incident to our attention. Moreover, the Government concedes that the INS promulgates Operations Instructions only after it has faced a situation a number of times;[3] accordingly, the fact that this Instruction was promulgated indicates the repetitive nature of the situation it describes. In these circumstances the prospect of future occurrences is not purely speculative. "[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). The fact that several incidents have occurred recently "is clear evidence of administrative willingness to grant such [entries] in appropriate cases if they are in fact lawful." *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 582, 100 S.Ct. 800, 806, 63 L.Ed.2d 36 (1980). In light of the record developed by appellants so far, the prospect of injury sometime in the reasonably foreseeable future seems fairly probable.

Appellants have thus pointed to a systematic and administratively authorized pattern of governmental behavior which they allege to be illegal, and as a result of which they have probably suffered injuries in the past and are reasonably likely to suffer injury in the future. This is sufficient to establish standing. *Cf. City of Los Angeles v. Lyons,* 461 U.S. 95, 105–06, 103 S.Ct. 1660, 1667, 75 L.Ed.2d 675 (1983) (allegation that the Government authorizes the behavior in issue is sufficient to confer standing to challenge the behavior on those who have been injured in the past). Moreover, if appellants are ultimately victorious, relief from the foreign competition engendered (or at least tolerated) by the challenged governmental action will not be conjectural, but immediate. That kind of competition will be stopped. *See Simon v. Eastern Kentucky Welfare,* 426 U.S. at 45 n. 25, 96 S.Ct. at 1927 n. 25 (in which the Court notes that the "complaint in *Data Processing* alleged injury that was directly traceable to the action of the defendant federal official, for it complained of injurious competition that would have been illegal without that action"); *compare id.* at 42–43, 96 S.Ct. at 1926–1927 (relief sought by plaintiffs in *Simon* (withdrawal of hospital's exemption from taxation) not traceable to alleged injury (lack of charitable medical care) since hospitals may restrict such care even if exemption removed); *Babbitt v. United Farm Workers,* 442 U.S. 289, 304, 99 S.Ct. 2301, 2311, 60 L.Ed.2d

---

**3.** The State Department likewise accepts the challenged Operations Instruction.

895 (1979) (union's challenge of state law restricting access to employer's property not justiciable because "it is conjectural to anticipate that access will be denied.") We conclude therefore that appellants have a sound basis for claiming past and potential injury as a result of the official conduct of which they complain and that a favorable decision will probably provide redress.

### B.

In order to decide whether appellants fall within the "zone of interest" surrounding §§ 101(a)(15)(H) and 212(a)(14), and therefore present a claim which the federal courts may entertain under the prudential concerns of the standing requirement, we must look to the congressional objective behind the Act.

> As formulated in this circuit, the zone of interests test "requires some indicia—however slight—that the litigant before the court was intended to be protected, benefited or regulated by the statute under which suit is brought." *Copper & Brass Fabricators Council[, Inc. v. Dep't of the Treasury,* 679 F.2d 951, 952 (D.C.Cir.1982) ]; *accord American Friends Service Committee [v. Webster,* 720 F.2d 29, 49–59 (D.C.Cir.1983) ] (zone test requires slight beneficiary indicia).

*Autolog Corp. v. Regan, supra,* 235 U.S. App.D.C. at 182, 731 F.2d at 29 (footnote omitted). For this purpose we look to the Act itself and to its legislative history. *Copper & Brass Fabricators Council v. Dept. of the Treasury,* 220 U.S.App.D.C. 133, 679 F.2d 951 (1982).

The wording of the statute gives a clear indication of the interests which § 212(a)(14) was designed to protect. This provision specifically excludes alien workers whose entry "will ... adversely affect the wages and working conditions of the workers in the United States similarly employed." This indicates congressional concern for and a desire to protect the interests of the American workforce. The background of the statute reinforces this conclusion.

Congress initially passed legislation to exclude foreign labor in the Act of Feb. 26, 1885, c. 164, 23 Stat. 332. That statute prohibited entry of contract laborers, *i.e.,* unskilled aliens who agreed to work at very low wages (usually for railroads) in exchange for passage to the United States. The history of that legislation clearly established that Congress intended to protect American labor from an influx of cheaper foreign competition. *Church of the Holy Trinity v. United States,* 143 U.S. 457, 463–65, 12 S.Ct. 511, 513–14, 36 L.Ed.2d 226 (1892); *see also United States v. Laws,* 163 U.S. 258, 266, 16 S.Ct. 998, 1001, 41 L.Ed. 151 (1896) (the influx of foreigners "tended to degrade American labor").

In the twentieth century, Congress enacted a comprehensive immigration code in the Immigration Act of 1924, Pub.L. No. 68–139, 43 Stat. 153. Section 3(2) of that act reads very much like § 101(a)(15)(B) of the 1952 Act. The Supreme Court had the opportunity to interpret § 3(2) in *Karnuth v. United States,* 279 U.S. 231, 49 S.Ct. 274, 73 L.Ed. 677 (1929). *Karnuth* involved non-Canadian citizens who regularly crossed the Canadian border to work in the United States. The Court upheld a regulation providing that entry to perform labor does not fall within the provision allowing entry for business. The Court noted: "The history of this legislation points clearly to the conclusion that one of its great purposes was to protect American labor against the influx of foreign labor." 279 U.S. at 243, 49 S.Ct. at 278. The Court then concluded that the statute did not permit the entry under the circumstances of that particular case given the "competition with American workmen, whose protection it was one of the main purposes of the legislation to secure." *Id.* at 244, 49 S.Ct. at 279.[4]

From 1952 through 1965, the current Immigration and Nationality Act provided for

---

**4.** Appellants rely strongly on *Karnuth* in their arguments regarding the merits of this case. Our discussion of that decision with respect to the "zone of interest" surrounding §§ 101(a)(15) and 212(a)(14) is not, however, intended or designed to have any bearing on the merits.

the exclusion of alien laborers only if the Secretary of Labor certified that the influx would compete with or otherwise affect adversely the American workforce. The legislative history of that Act (as initially passed) clearly evinces a congressional purpose to keep American labor stalwart in the face of foreign competition in the United States:

> While the bill will remove the "contract labor clauses" from the law, it provides safeguards for American labor.... It is the opinion of this committee that [§ 212(a)(14)] will adequately provide for the protection of American labor against an influx of aliens entering the United States for the purpose of performing skilled or unskilled labor where the economy of individual localities is not capable of absorbing them at the time they desire to enter this country.

H.Rep. No. 1365, 82d Cong., 2d Sess. (1952), *reprinted in* 1952 U.S.Code Cong. & Ad.News 1653, 1705. In 1965, Congress revised the 1952 Act and amended § 212(a)(14) to its current form: alien labor is admitted only if the Secretary of Labor finds that American labor will not be adversely affected by the entry. Pub.L. No. 89–236, 79 Stat. 911, 917–18 (1965). In the legislative history, Congress indicated that the purpose of the change was to strengthen the protection of American labor. S.Rep. No. 748, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.Code Cong. & Ad.News 3328, 3333.

Congress has thus been concerned with the impact of competition by foreigners on the American labor force since 1885, and has passed increasingly restrictive legislation on the entry of nonimmigrant alien workers. This court has held that statutes designed for the protection of the American workers create a sufficient "zone of interest" to confer upon those workers a proper ground for standing. *Autolog Corp.*, 235 U.S.App.D.C. at 182–84, 731 F.2d at 29–31. We must conclude that

appellants fall within the "zone of interest" created by the Act before us, and that they can properly assert a violation of §§ 212(a)(14) and 101(a)(15)(H), the provisions designed in part for their benefit.

## IV.

■ The problems related to mootness are similar to those which pertain to standing. But the standing inquiry looks to the nature of the injury to the recipient,[5] while mootness turns on whether an injury, already determined to be of the type amenable to judicial action, still exists and can be properly recompensed by the relief requested. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 103 S.Ct. 1660, 1667, 75 L.Ed.2d 675 (1983) (complaint may establish claim for damages, but not for prospective, equitable relief). In the case at hand, this means we must determine whether the completion of the sawmill in Kane, Pennsylvania, prior to appellants' institution of this suit, makes this case moot and renders inappropriate the prospective relief requested in the complaint.

The district court held this case to be moot under the Supreme Court's decision in *Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983) (*per curiam*). *Iron Arrow*, however, is inapplicable here. There, an all-male organization at the University of Miami sought declaratory and injunctive relief prohibiting the Secretary of Health and Human Services from enforcing regulations prohibiting gender discrimination by institutions receiving federal funds. While the case was pending, the university president established a policy prohibiting all-male organizations from operating on campus. The Court held the dispute to be "classically 'moot'." 104 S.Ct. at 375.

> We think that no resolution of the present dispute between the parties can redress Iron Arrow's asserted grievances. Whatever the correctness of the Secretary's interpretation of the Regula-

---

5. "[I]t is the injury and not the party that determines Article III standing." *Cardenas v. Smith,*

236 U.S.App.D.C. 78, 733 F.2d 909, 913 (1984).

tion in question, the University has stated unequivocally that it will not allow Iron Arrow to conduct its initiation activities on University property as long as it refuses to admit women.

*Id.* In other words, the university president's decision rendered irrelevant the sole issue in the lawsuit, *i.e.*, whether the organization could operate on the University of Miami campus as an all-male organization despite the HHS regulations. Regardless of that regulation, *Iron Arrow* could no longer operate as an all-male entity. In sharp contrast, the unions here have challenged the continuing scheme by which the Government interprets the Immigration Act—without specific reliance on any particular factual setting. Appellants say expressly that the Government's "issuance of visas to foreign nationals employed in Kane, Pennsylvania *is characteristic of a regular practice by the defendants* that has adversely affected the job opportunities of [appellant-union's] members." Complaint, ¶ 26 (emphasis added). The complaint does not hinge on the particular facts of one incident, but draws into question the continuing bearing of the challenged Operating Instruction on the full statutory scheme. That claim for general prospective relief is justiciable. *Seatrain Shipbuilding Corp.*, 444 U.S. at 580–82, 100 S.Ct. at 805–06.

Moreover, the appellants continue to suffer an ongoing injury. The Operations Instruction creates a continuing opportunity for importers of foreign equipment to choose between American and foreign installers—a choice which they would not have but for the Instruction. The Instruction encourages them to contract with a foreign supplier for installation by aliens. This, of course, is the real controversy between the parties because it allows the importers to contract away the union's opportunity to have its members perform the necessary work in this country. The Supreme Court has considered challenges to statutes and regulations in similar situations, where the specific incidents which led to the suit have passed, if the disputed statute or regulation creates a situation in which a party's economic position is affected. For example, in *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), the Supreme Court considered the constitutionality of a zoning ordinance which prohibited groups of unrelated individuals from sharing a house. The Court held that the case was not moot—despite the fact that the specific tenants listed in the complaint were no longer in residence—because the case could still have an economic impact on the landlord:

> Here we are a step closer to the impact of the ordinance on the value of the lessor's property. He has not only lost six tenants and acquired only two in their place; it is obvious that the scale of rental values rides on what we decide today.

*Id.* at 9, 94 S.Ct. at 1541. Similarly, in *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), the Court held justiciable a challenge to a state statute which established a benefit program for striking workers even though the particular strike had ended:

> [T]he challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of petitioning parties.

*Id.* at 122, 94 S.Ct. at 1698. Similarly, the on-going economic incentives arguably created by the challenged Operations Instruction are sufficient to create a current justiciable controversy.

## V.

The parties have suggested that, if we find the case to be justiciable, we decide the merits ourselves. However, discovery in this case was abbreviated, and the parties have alluded to legal arguments which they have not had the opportunity to brief fully. In these circumstances, the merits are best presented to the district court in the first instance. For the reasons given above, we reverse the decision of the dis-

trict court and remand for further proceedings on the merits of appellants' complaint.

*Reversed and Remanded.*