180 F.3d 727
 AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES; Jim Davis;
Scott Blanch; David C. Sheffer; Jesse R. Salcedo; Darrell
Williams; Michael D. Dearing; George H. White; Hill/DDO/95
Inc.; George Carriker; Harry Burnette; Daniel Sosa; Louis H.
Harwell, Jr.; Connie K. Scarborough; Luanne Lewis,
Plaintiffs-Appellants,
v.
William J. CLINTON, President of the United States, et al.,
Defendants-Appellees.
 No. 98-3385.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 11, 1999.
Decided and Filed June 15, 1999.
 
 Appeal from the United States District Court for the Southern District of Ohio at Columbus. No. 96-00283--George C. Smith, District Judge.
 ARGUED: Martin R. Cohen, Bala Cynwyd, Pennsylvania, for Appellants. Robert M. Loeb, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, APPELLATE STAFF, Washington, D.C., for Appellees. ON BRIEF: Martin R. Cohen, Bala Cynwyd, Pennsylvania, for Appellants. Robert M. Loeb, William Kanter, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, APPELLATE STAFF, Washington, D.C., for Appellees. Gary E. Cross, DUNAWAY & CROSS, Washington, D.C., for Amicus Curiae.
 Before: SILER, DAUGHTREY, and GILMAN, Circuit Judges.
 SILER, Circuit Judge.
 
 
 1
 The plaintiffs appeal the dismissal of their claims for lack of standing and nonjusticiability. For the reasons given below, we AFFIRM.
 
 BACKGROUND
 
 2
 The plaintiffs are current and former civilian employees of Air Force depots; the American Federation of Government Employees ("AFGE"), an international union that represents about 700,000 federal government employees; and Hill/DDO/95 Incorporated ("Hill"), a non-profit organization interested in the economic development of the Hill Air Force Base. The plaintiffs challenge the decision to put the workloads of the Newark Air Force Base, the McClellan Air Force Base, and the Kelly Air Force Base out for bid by private contractors only, following earlier decisions to close the bases under the Defense Base Closure and Realignment Act of 1990, 10 U.S.C. § 2687 (1994). The plaintiffs assert their claims for declaratory and injunctive relief under the Administrative Procedures Act ("APA"), 5 U.S.C. § 702.
 
 
 3
 The plaintiffs argue that the workload performed at Newark, Kelly, and McClellan Air Force Bases was designated as "core logistics" work. For national security reasons, core work must be done only by federal employees who report directly to the military. See 10 U.S.C. § 2464(b)(1). The Secretary of Defense designates which functions are "core." See 10 U.S.C. § 2464(a). The Secretary may waive the core designation. See 10 U.S.C. § 2464(b)(2). Under 10 U.S.C. § 2464(b)(2), plaintiffs argue, if the Secretary does waive the core designation of a workload, the workload can only be considered for conversion to private performance in accordance with OMB Circular A-76, which requires competition between public and private bidders. The plaintiffs argue that the Secretary did not waive the core designation at the three bases and that only private contractors were allowed to bid on the transferred workload. They assert that this conduct thus is a violation both of the statute and of Circular A-76, which would only apply if the Secretary waived the core designation.
 
 
 4
 The plaintiffs also cite 10 U.S.C. § 2469 for the proposition that the depot-level maintenance or repair workload, whether consisting of core or non-core logistics functions, can only be transferred to a contractor or another depot through the use of (1) "merit-based selection procedures for competitions among all depot-level activities of the Department of Defense ['DoD']; or (2) competitive procedures for competitions among private and public sector entities."[1] The plaintiffs argue that under 10 U.S.C. § 2470, a depot-level activity of the DoD is entitled to compete for the performance of any depot-level maintenance and repair workload of a Federal agency for which competitive procedures are used.
 
 
 5
 The defendants moved to dismiss, based in part on the plaintiffs' lack of standing. The district court granted defendants' motion, and denied motions by the plaintiffs for a preliminary injunction and temporary restraining order. It held that the plaintiffs had not shown "injury in fact," and thus lacked Article III standing; that they lacked prudential standing; and that §§ 2464, 2469, and 2470 implicated nonjusticiable political questions and therefore were not subject to judicial review.
 
 DISCUSSION
 
 6
 Article III Standing--Individual Plaintiffs
 
 
 7
 For purposes of ruling on a motion to dismiss for lack of standing, a complaint must be viewed in the light most favorable to the plaintiff; all material allegations of the complaint must be accepted as true. See Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Plaintiffs, however, bear the burden of persuading the court that it has subject matter jurisdiction. See Rogers v. Stratton Indus., Inc., 798 F.2d 913, 915 (6th Cir.1986). A party's standing is a question of law reviewed de novo. See Greater Cincinnati Coalition for the Homeless v. City of Cincinnati, 56 F.3d 710, 715 (6th Cir.1995).
 
 
 8
 To establish Article III standing to sue in federal court, an individual plaintiff must show that (1) he or she has suffered an "injury in fact"; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury will likely be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).
 
 
 9
 The district court correctly read Dalton v. Specter, 511 U.S. 462, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994), as foreclosing review of the decision to close the three bases. The closures were the result of the 1993 and 1995 Base Realignment and Closure Commission Reports, themselves made pursuant to and in accordance with the Defense Base Closure and Realignment Act of 1990. The Supreme Court held that "[w]here a statute, such as the 1990 Act, commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." Dalton, 511 U.S. at 477.
 
 
 10
 The plaintiffs do not challenge the closures, however, but instead challenge the procedures by which base workloads were assigned to private contractors. Basically, they assert that the workloads should have been assigned to other military bases as "core logistics work" pursuant to 10 U.S.C. § 2464(b)(1), or that if the Secretary of Defense had exercised his discretion and waived the core designation, public and private bidders should have competed for the workloads in accordance with OMB Circular A-76. They argue that the failure to transfer the workload to other military bases, or at least to give those bases the opportunity to compete for the workload, injured their employment or employment prospects in various ways.
 
 
 11
 However, a plaintiff's injury must be "concrete and particularized." Lujan, 504 U.S. at 560. The alleged injury must be "actual or imminent, not 'conjectural' or 'hypothetical.' " Id. at 560. A crucial question in this case is whether the plaintiffs' injuries are sufficiently concrete and particularized, or sufficiently actual and imminent, to establish injury in fact. Some attention must therefore be given to the injuries asserted in the complaint.
 
 
 12
 One group of plaintiffs includes former employees at Newark, either working for Rockwell, the private contractor who assumed the Newark workload, or not working at all. Those plaintiffs still employed argue that their jobs with the private contractor pay lower salaries and have less generous benefits than their federal employment. A sample of the argument follows: "If other federal installations had been permitted to bid on the Newark AFB workload one of those installations would have won the bid and Mr. Sheffer would have been able to remain a federal employee by moving to the winning installation through the agency's Priority Placement Program, (PPP)." Plaintiffs Sheffer and Dearing, initially hired by Rockwell, were terminated after the complaint was filed. The plaintiffs also assert that eighty-five of the former Newark employees hired by Rockwell were later terminated.
 
 
 13
 Two other plaintiffs, Scarborough and Lewis, formerly worked at Hill AFB and lost their jobs in a reduction in force. They argue that if proper procedures had been followed, they would have had a greater chance of remaining employed. A sample of this argument follows:
 
 
 14
 [Scarborough] was removed from her job through a Reduction in Force action as the result of a lack of calibration related workload. Her skills and the skills of her group were such that the calibration work of the Newark AFB could have been done by them at a very low price however bidding [sic ] by the defendants herein did not permit Hill AFB and/or her work group to bid on that work and as a result she lost her federal job. When any of the core work at NAFB, MAFB and/or KAFB is performed by non-federal employees, Ms. Scarborough's federal career prospects were and are hurt. Likewise when any federal work at the aforesaid bases is put out for bid in a competition that bars federal installations from the bidding, her federal career prospects were and [sic ] hurt. Thus for example if the work at KAFB were bid on and won by e.g. Hill AFB, Ms. Scarborough would have the option of possibly working again at Hill AFB. If the work was bid on and won by Hill AFB, this would improve Ms. Scarborough's chances of remaining employed or being employed at Hill AFB. The defendants' illegal actions thus directly harm her and her family.
 
 
 15
 Three plaintiffs presently work at Kelly and McClellan Air Force Bases, also slated for closing. These plaintiffs argue that if the proper procedures were followed, they would have a greater chance of remaining employed by the federal government.
 
 
 16
 Another three plaintiffs presently work at Warner Robins Air Force Base. Another plaintiff "expects to be rehired to his old job" at Hill Air Force Base in the near future. These plaintiffs argue that "employees working or who formerly worked on the above referenced workload at NAFB, MAFB and/or KAFB ... in the event of a reduction in force ... because of lack of work and/or the inability of Warner Robins [or Hill] to bid on the NAFB, MCAFB and KAFB workload, would be able to compete for and displace" the plaintiffs from their jobs.
 
 
 17
 One plaintiff, presently working at Tinker Air Force Base, asserts more generally that his federal career prospects are hurt by the defendants' actions. He argues that if work at the closing bases were bid on and won either by Tinker Air Force Base, or by another base where he might have an opportunity to work, he would have greater opportunities either for career advancement or simply for remaining employed.
 
 
 18
 We find the asserted injuries too speculative, and insufficiently concrete and particularized, to establish Article III standing. If the injuries at issue are the loss or possible loss of jobs, it is difficult to show that those injuries are "caused" by the failure to follow prescribed procedures, or that they would be redressable by the relief the plaintiffs seek. The Secretary has the discretion to waive the core designation. Other bases might choose not to bid, or might not win a bidding competition. Even if those bases did acquire the workload of the closed bases, the plaintiffs might not obtain employment there.
 
 
 19
 If the injury at issue is simply harm to the plaintiffs' employment prospects, that injury is insufficiently concrete and particularized to establish Article III standing. Numerous acts and facts may injure employment "prospects" in some unknowable and speculative fashion, but something more is needed to establish standing to sue.
 
 
 20
 The scenario here is similar to that of National Maritime Union of America, AFL-CIO v. Commander, Military Sealift Command, 824 F.2d 1228 (D.C.Cir.1987). In National Maritime, unions representing employees of unsuccessful bidders for government contracts challenged the contract award, alleging that the failure to include a specific wage and benefit determination from the Labor Secretary violated the Service Contract Act. See id. at 1235. While the District of Columbia Circuit found that the loss of present or future jobs as a result of the contract award might constitute a "distinct and palpable" injury (in a way that mere harm to employment "prospects" alleged by some of the plaintiffs here does not), that injury was "neither fairly traceable to the putatively illegal omission of a wage determination from the contract nor fairly redressable by the remedy the Unions seek." Id. Nothing suggested that the winning bidder would not have won the contract anyway, that the losing bidder would have participated in a rebidding, or that the government's internal cost analysis would have changed. These facts, along with the "uncertainty about the effect of the private bidders' assumed wage and benefit levels on the bids in the second round of bidding[,]" all pointed "to a single conclusion that the injury to the Unions' members is causally speculative." Id. at 1236. Here, the fact that the Secretary can simply waive the core designation, and the inability to show a likelihood that the plaintiffs would acquire different or better jobs if mandated procedures were followed, make the injuries to these plaintiffs causally speculative as well.
 
 
 21
 A case in which the District of Columbia Circuit did find standing for a group of union employees is distinguishable from our facts. In International Union of Bricklayers and Allied Craftsmen v. Meese, 761 F.2d 798 (D.C.Cir.1985), unions challenged Immigration and Naturalization Service ("INS") guidelines for determining when aliens might enter the United States to perform work. The plaintiffs charged that the State Department and INS had violated statutory procedures in issuing work visas to aliens when the plaintiffs and other union members were "ready, willing and able" to perform work on a sawmill. Id. at 800. The court noted that if the plaintiffs were victorious, "relief from the foreign competition engendered (or at least tolerated) by the challenged governmental action will not be conjectural, but immediate. That kind of competition will be stopped." Id. at 803. The facts here, on the other hand, suggest conjectural rather than "immediate" relief. If the Secretary of Defense were forbidden to allow private contractor bidding on core logistic work, he could simply waive the core designation. It is also conjectural whether the plaintiffs would acquire better jobs, or any jobs at all, following a judicial order that particular ongoing depots be allowed to bid on work of closed depots. The facts here are much more like those of Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), cited by way of contrast in Bricklayers, 761 F.2d at 803. The Court found in Simon that the relief sought by the plaintiffs (withdrawal of a hospital's tax exemption) was not traceable to the alleged injury (denial of hospital care to indigent patients), since hospitals might restrict such care even if the exemption were removed. Simon, 426 U.S. at 42-43.
 
 
 22
 Traceability and redressability also distinguish this case from American Federation of Govt. Employees v. Cohen, No. 98-1504, 1999 WL 144801 (7th Cir. March 18, 1999). The plaintiffs in Cohen challenged the Army's failure to comply with procurement and contracting statutes in awarding two defense projects to private contractors. Cohen, 171 F.3d 460, 1999 WL 144801, at * 1. The plaintiffs in Cohen were all employees of one arsenal, and maintained that if the Army had complied with the statutes, "the projects would have been performed at their government facility, thereby preserving federal job opportunities." Id. (emphasis added). In finding that the plaintiffs had met the requirements for Article III standing, the Seventh Circuit found that they had alleged an actual loss of job benefits as the result of a reduction in force ("RIF"), that they could reasonably trace this loss to the Army's procurement and contracting procedures, and that the alleged injury would be redressed by a favorable decision. More specifically, the court noted allegations and evidence that "lack of workload" was the only reason for the RIF, and that under proper analysis and procedures all the tank gun mounts would have been produced at the plaintiffs' arsenal. See id. at * 3-* 5.
 
 
 23
 The plaintiffs here cannot make this clear showing. Their injuries tend to involve a potential loss of job benefits, not an actual one. Nor is any loss of benefits clearly traceable to a RIF which resulted (under the Cohen plaintiffs' allegations) solely from the failure to follow mandatory procedures. Here, on the contrary, any benefit loss results most clearly from the unchallengeable and unchallenged decision to close bases. Moreover, the plaintiffs here cannot show a likelihood, as opposed to a mere possibility, that a favorable decision of the court would redress their injury. See Cohen, 171 F.3d 460, 1999 WL 144801, at * 7 (citing Steel Co. v. Citizens for a Better Tomorrow [sic], 523 U.S. 83, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998) ("plaintiffs must show that it is likely, rather than merely possible, that a favorable decision by the court would redress the injury")).
 
 Article III Standing--AFGE
 
 24
 AFGE brought suit in its representational capacity. "An organizational plaintiff ... may have standing to sue on its own behalf 'to vindicate whatever rights and immunities the association itself may enjoy' or, under proper conditions, to sue on behalf of its members asserting the members' individual rights." Common Cause v. FEC, 108 F.3d 413, 417 (D.C.Cir.1997) (quoting Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). AFGE must show that (1) at least one of its members has standing to sue in his or her own right; (2) the interests the suit seeks to vindicate are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. See UAW v. Brock, 477 U.S. 274, 282, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986).
 
 
 25
 Because none of the individual employees has established standing to sue, AFGE lacks standing also.
 
 
 26
 Hill/DDO/95 Inc.
 
 
 27
 Hill/DDO/95 Inc. is a non-profit corporation incorporated in Utah. "Its mission is to encourage the economic development of the Hill Air Force Base and its surrounding community." Hill argues that because Hill AFB was not allowed to bid on workload of the closing bases, the community in Utah was harmed, since Hill AFB might have been able to obtain the workload. "As a result many jobs were lost by the State of Utah."
 
 
 28
 In light of the previously discussed case law, Hill's claims are also speculative and conjectural, and Hill also lacks standing to sue.[2]
 
 Prudential Standing/Justiciability
 
 29
 Because we find that the plaintiffs' claims do not satisfy the requirements for Article III standing, it is unnecessary to address the prudential standing and justiciability issues.
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 Section 2469(c) states that OMB Circular A-76 does not apply; this seems to contradict § 2464(b)(2). The two provisions are reconcilable, however, by reading § 2464(b)(2) to make Circular A-76 applicable only where the Secretary has explicitly waived core workload designation. Otherwise, reassigned core workload is to be competed under § 2469(a)(1), and non-core workload under § 2469(a)(2)
 
 
 [2]
 Hill also would have problems establishing prudential standing, since its claims clearly involve " 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting Warth, 422 U.S. at 499-500)