COMMUNITIES FOR EQUITY,
et al., Plaintiffs,

v.

MICHIGAN HIGH SCHOOL
ATHLETIC ASSOCIATION,
et al., Defendants.

No. 1:98–CV–479.

United States District Court,
W.D. Michigan,
Southern Division.

Jan. 21, 2000.

H. Rhett Pinsky, Pinsky, Smith, Fayette & Hulswit, Grand Rapids, MI, Marcia D. Greenberger, Washington, DC, Kristen Galles, Equity Legal, Alexandria, VA, Neena Chaudhry, Barbara A. Burr, Washington, DC, for Communities for Equity, Diane Madsen, Jay Roberts–Eveland.

Edmund J. Sikorski, Ann Arbor, MI, for Michigan High School Athletic Association.

William M. Azkoul, Azkoul & Azkoul, Grand Rapids, MI, for John Roberts,

Keith Alto, Geraldine David, Keith Eldred, Paul Ellinger, Eric Federico, Dan Flynn, Margra Grillo, Robert Grimes, Norm Johnson, Dewayne Jones, Dennis Kniola, William Newkirk, Thomas Rashid, Robert Riemersma, Randy Salisbury, Joyce Seals, Michael Shibler, Unknown Does 1–50, Christi Brilinski, Eunice Moore.

Charles R. Gross, U.S. Attorney's Office, Grand Rapids, MI, for U.S.

## OPINION

ENSLEN, Chief Judge.

### Introduction

On June 26, 1998, Plaintiffs, consisting of the parents of two female student-athletes and an organization named Communities for Equity ("CFE"), filed a class action lawsuit alleging that the Michigan High School Athletic Association ("MHSAA") discriminated against female athletes. Plaintiffs allege that the discrimination took a variety of forms including: (1) providing more participation opportunities to boys than girls; (2) requiring girls to play in "non-traditional" seasons; (3) operating shorter seasons for girls than boys; (4) scheduling female athletes to compete on less desirable dates than their male counterparts; (5) providing inferior athletic facilities for girls athletic tournaments in comparison to boys athletic tournaments; (6) requiring girls to play in some sports under rules that differ from the rules of the National Collegiate Athletic Association ("NCAA"); and (7) allocating more resources to support and promote boys athletic programs.[1]

At this point in the litigation, Plaintiffs assert claims against the MHSAA and the individual members of the MHSAA Representative Council in their official capacity. Claims One and Two arise under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq., ("Title IX"). Claim Three arises under the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983. Claims Four and Five arise under Michigan's Elliott–Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.3101 et. seq. Plaintiffs seek declaratory, injunctive and monetary relief.

There are three motions currently before the Court. The first motion is Defendants' Renewed Motion for Summary Judgment for Lack of Standing. The second is the Individual Defendants' Renewed Motion for Summary Judgment. The third is Defendant MHSAA's Supplemental Motion for Summary Judgment Pursuant to FRCP 56(c) as to the First and Second Claim of Plaintiffs and Motion Pursuant to FRCP 12(b)(6) as to Plaintiffs' Third Claim of Relief.

These motions raise four distinct issues. First, are Defendants properly subject to Title IX's requirements if they do not receive federal financial assistance? Second, are Defendants "state actors?" Third, do Plaintiffs have standing to sue? Fourth, even if Defendant MHSAA is subject to Title IX, may the Individual Defendants be sued in their official capacities?

### Discussion

Summary judgment requires that the Court determine whether the Plaintiffs have presented enough evidence so that a jury could reasonably find for them. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir.1993). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. In addition, when considering a summary judgment motion, the evidence of the non-

---

1. Plaintiffs filed an Amended Complaint on    July 27, 1998.

movant is to be believed and all justifiable inferences are to be drawn in his favor. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

## I. TITLE IX

Section 901(a) of Title IX of the Education Amendments of 1972 provides that "no person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A "program or activity" includes "all the operations of ... a college, university, or other post-secondary institution, or a public system of higher education .. any part of which is extended Federal financial assistance." 20 U.S.C. § 1687(2)(A).

In most Title IX cases, the plaintiff attempts to demonstrate that the defendant is either a direct or indirect recipient of federal funds. *See generally NCAA v. Smith*, 525 U.S. 459, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999); *U.S. Dept. of Transp. v. Paralyzed Veterans*, 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986); *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). In this case, however, there is no evidence that the MHSAA is either a direct or indirect recipient of federal funds. First, the MHSAA does not receive any direct assistance from the federal government. Second, the MHSAA receives the bulk of its funding from gate receipts generated at MHSAA-sponsored tournaments. Based upon this evidence, the MHSAA is neither a direct nor indirect recipient of federal funds. *See generally Smith*, 119 S.Ct. at 929–930 (holding that NCAA was not an indirect recipient of federal funds even though it received dues from schools that received federal funds); *Horner v. Kentucky High School Athletic Ass'n*, 43 F.3d 265 (6th Cir.1994) (holding that Kentucky High School Athletic Association was an indirect recipient of federal funds because it was created by state law, its functions were determined by the Kentucky Board of Education, and it received dues from member schools who received federal funds); *Yellow Springs, etc. v. Ohio High Sch. Ath. Ass'n*, 647 F.2d 651 (6th Cir. 1981) (holding that Ohio High School Athletic Association was not a recipient of federal funds because it did not receive direct federal assistance, and it did not receive money from local schools who were recipients of federal assistance).

Although this might ordinarily end the Court's inquiry and justify a decision to grant Defendants' Motion for Summary Judgment, both Plaintiffs and the United States as amicus curiae argue that even though the MHSAA is not a federal aid recipient, it is nonetheless subject to Title IX. The premise of this argument is that because local Michigan school districts have "ceded control" over interscholastic athletics to the MHSAA, and because interscholastic athletic programs receive federal financial assistance, MHSAA has control over a federally funded activity and should be subject to Title IX. This precise issue was left unresolved by the recent Supreme Court decision in *Smith* which explicitly declined to consider whether, "when a recipient cedes controlling authority over a federally funded program to another entity, the controlling entity is covered by Title IX regardless [of] whether it is itself a recipient." *Id.* at 930.

Given that the Supreme Court has left this issue unresolved, the Court believes that it must analyze two questions to resolve Defendants' motions relating to Title IX. First, as a matter of law, is the exercise of controlling authority over a federally funded program sufficient to trigger Title IX? Second, is there a genuine issue of material fact as to whether local Michigan school districts have ceded controlling authority over interscholastic athletics to the MHSAA, such that the MHSAA effectively controls those athletic programs? Each of these issues will be addressed in turn.

## A. Legal Question

Turning first to the legal question, few courts have considered whether exercising "controlling authority" over a federally funded activity is sufficient to subject an entity to Title IX. *See generally Cureton v. NCAA,* 37 F.Supp.2d 687 (E.D.Pa.1999) (holding, in part, that the NCAA was subject to Title VI because it exercised controlling authority over athletic programs receiving federal financial assistance) *rev'd Cureton v. NCAA,* 198 F.3d 107 (3rd Cir. 1999) (holding that the NCAA did not exercise "controlling authority" over school athletic programs). *See also Kemether v. Penn. Interscholastic Athletic Assoc.,* 1999 WL 1012948 (E.D.Pa. Nov.8, 1999) (holding that Title IX subjects state athletic association to suit under the theory that association controls athletic programs receiving federal aid). For the reasons stated below, the Court does not find the reasoning in these non-controlling cases to be persuasive.

This Court's analysis begins with *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). In *Cannon,* the Supreme Court was asked to determine whether Title IX implied a private right of action. In deciding this question, the Supreme Court engaged in an analysis of the history, subject matter, and purpose of Title IX. That analysis led the Supreme Court to two related conclusions. First, the Supreme Court concluded that the wording and purpose of Title IX indicated that it was enacted for the benefit of a particular class of people—those discriminated against on the basis of sex. *Id.* at 689–91, 99 S.Ct. 1946. In reaching this conclusion, the Supreme Court explicitly rejected the proposition that Title IX was enacted "as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices." *Id.* at 691–92, 99 S.Ct. 1946. Second, the Supreme Court recognized that Title IX "sought to accomplish two related, but nevertheless somewhat different objectives ... Congress wanted to avoid the use of federal resources to support discriminatory practices; [and] it wanted to provide individual citizens effective protection against those [discriminatory] practices." *Id.* at 704, 99 S.Ct. 1946. In reaching this conclusion, the Supreme Court explained that a private right of action, in contrast to a suit brought by the federal government, was "fully consistent with—and in some cases even necessary to—the orderly enforcement of the statute." *Id.* at 705–06, 99 S.Ct. 1946. Based upon this analysis, the Supreme Court concluded that Title IX implied a private cause of action.

■ Based in large part upon the Supreme Court's understanding of Title IX in *Cannon,* this Court is convinced that any entity which has controlling authority over a "program or activity receiving Federal financial assistance" is subject to Title IX's anti-discrimination rule, even if that entity does not itself receive the federal funds which finance the program or activity. In reaching this conclusion, the Court rejects Defendants' argument that only recipients of federal funds are subject to Title IX because this interpretation is at odds with the plain meaning and purpose of the statute.

To begin with, Section 902 of Title IX does not, on its face, confine the list of potential defendants to "recipients" of federal funds. Instead, it simply prohibits discrimination "under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). While the most likely entity subject to this prohibition would be a school district that is a recipient of federal aid, there is nothing in the statute which limits the class of potential defendants to such recipients. Instead, the statute prohibits discrimination, presumably by anyone, "under any education program or activity receiving Federal financial assistance." *Id.*

This interpretation of the statute is supported by the Supreme Court's analysis in *Cannon.* In that case, the Supreme Court made it clear that Title IX did not simply ban discrimination by recipients of federal

funds; it provides a remedy for individuals who have been discriminated against on the basis of sex in the operation of programs receiving federal aid. *See Cannon,* 441 U.S. at 691–92, 99 S.Ct. 1946. Defendants ask the Court to interpret Title IX as only applying to recipients of federal funds, but this is precisely the interpretation of Title IX that the Supreme Court seemed to reject in *Cannon. Id.*

Not only is Defendants' suggested interpretation of Title IX unsupported by the plain meaning of Title IX and the *Cannon* decision, it is empty formalism. If Defendants' interpretation prevailed, Title IX would prohibit "recipients" of federal funds from discriminating on the basis of sex, but would allow entities that controlled those funds to discriminate so long as those entities were not themselves "recipients." Such a scheme would not only encourage "recipients" of federal funds to transfer control over those funds to others (because both parties could thereby avoid Title IX liability), it would allow federal funds to promote gender discrimination so long as the recipients of those funds empowered someone else to promulgate the discriminatory policies. In this Court's view, such a formalistic interpretation is not warranted by the meaning or purpose of the statute.

Although the Court concludes that exercising "controlling authority" is sufficient to subject an entity to liability under Title IX, it must acknowledge that prior Supreme Court and Sixth Circuit precedent has implied that Title IX is only triggered if the defendant is a "recipient" of federal money. *See Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984) (examining whether Grove City College was a recipient of federal financial assistance in order to determine whether it was subject to Title IX); *U.S. Dept. of Transp. v. Paralyzed Veterans,* 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986) (stating that Congress limited the scope of § 504 of the Rehabilitation Act—a statute with similar wording and history to Title IX—to cover only entities that receive federal financial assistance); *Horner v. Kentucky High Sch. Ath. Ass'n,* 43 F.3d 265 (6th Cir.1994) (examining extent to which Kentucky High School Athletic Association ("KHSAA") could be considered a recipient of federal financial assistance in order to determine whether it was subject to Title IX).[2]

While the Court is mindful of these three decisions, it concludes that they are not conclusive on the issue currently before the Court. The Court reaches this conclusion for three reasons.

First, none of these cases explicitly considered the "controlling authority" rationale. Therefore, while these cases focused on whether certain defendants were appropriately considered recipients of federal funds, these cases did not explicitly hold that only recipients could be Title IX defendants. *See Smith,* 119 S.Ct. at 929–930 (implying that the "controlling authority" theory of Title IX liability has not been addressed by the Supreme Court).

Second, the holdings in all three of these cases are logically consistent with the "controlling authority" theory of liability. *See Grove City,* 465 U.S. at 563–570, 104 S.Ct. 1211 (finding that Grove City College was a proper defendant under Title IX where it had obvious control over its own financial aid program which was funded, in part, by federal grants); *Paralyzed Veterans,* 477 U.S. at 604–611, 106 S.Ct. 2705 (finding that air carriers were not subject to Title IX where they had no control over

---

**2.** As noted earlier, Section 902 of Title IX (20 U.S.C. § 1681(a)) does not use the term "recipient," although it does reference programs that "receive" federal funds. The Court suggests that one reason that courts have focused on "recipients" of federal funds is because entities that receive federal financial assistance will almost always be in control of those funds. Therefore, in the normal case, there is no need to inquire into who "controls" the funds. It is only in the rarest of cases, such as this one, where the entity that controls the federal funds and the entity that receives the federal funds are different, that the issue of control becomes important.

program which developed airports and received federal aid); *Horner,* 43 F.3d at 272 (finding that KHSAA was properly sued under Title IX where it had control over interscholastic athletic programs that were receiving federal financial assistance).

Third, the case which goes the furthest in implying that only recipients of federal funds may be subject to Title IX, *Paralyzed Veterans,* is inconsistent with the Supreme Court's explicit analysis in *Cannon.* In *Paralyzed Veterans,* the Supreme Court held that § 504 of the Rehabilitation Act only applied to recipients of federal funds, noted that § 504 and Title IX were similar statutes, and thereby implied that Title IX's requirements were similarly limited to recipients of federal aid. *See Paralyzed Veterans,* 477 U.S. at 605–606, 106 S.Ct. 2705. This implication, however, is at odds with the Supreme Court's analysis in *Cannon* that Title IX does more than simply prevent recipients of federal funds from discriminating on the basis of sex. *See Cannon* 441 U.S. at 691–92, 704–06, 99 S.Ct. 1946. Therefore, whatever implication arises out of *Paralyzed Veterans* is trumped by the Supreme Court's explicit analysis in *Cannon.*

Therefore, because the plain meaning of Section 902 of Title IX does not limit the class of defendants to recipients of federal funds, because the *Cannon* decision makes it clear that Title IX was designed to prevent sex discrimination in programs that are financed by federal money (as opposed to merely stopping recipients of federal resources from discriminating), because the precedent of the Supreme Court and the Sixth Circuit is consistent with the "controlling authority" theory of liability, and because holding otherwise would be nothing more than empty formalism, the Court concludes that any entity that exercises controlling authority over a federally funded program is subject to Title IX, regardless of whether that entity is itself a recipient of federal aid.

### B. Factual Question

■ Having concluded that "controlling authority" is a valid basis for Title IX

liability, the Court turns to whether Plaintiffs have offered sufficient evidence that the MHSAA possesses the necessary authority to create a genuine issue of material fact. In order to sustain this burden, Plaintiffs point to a variety of factors. First, they point out that local school districts receive federal funds and therefore those districts' athletic programs are "programs or activities receiving Federal financial assistance ...." *See* 20 U.S.C. § 1687(2)(A). Second, they note that the MHSAA's stated purpose is "to create, establish and provide for, supervise and conduct interscholastic programs throughout the state." Third, they argue that MHSAA promulgates rules and decisions that influence virtually every aspect of interscholastic athletics. Specifically, they point to: MHSAA's eligibility requirements, MHSAA's rules governing contests, MHSAA's rules relating to coaches, MHSAA's rules relating to the training of officials, MHSAA's decisions about the seasons in which certain sports will be played, MHSAA's rules relating to the number of practices that are allowed, and MHSAA's control over postseason competitions. In light of the fact that virtually every high school in Michigan is a member of MHSAA, each school agrees to be bound by the rules of MHSAA, and the MHSAA can impose sanctions on schools that violate its rules, the Plaintiffs argue that schools have ceded controlling authority over interscholastic athletics to the MHSAA.

In response, Defendants argue that MHSAA receives no money from its member schools either directly or indirectly. Furthermore, they point out that Michigan law vests a non-delegable duty to regulate interscholastic athletics in local school boards. More specifically, they counter Plaintiffs' assertion that local schools have ceded control over interscholastic athletics with the following facts: individual schools are solely responsible for decisions about what teams to sponsor, MHSAA rules must be formally adopted by local school districts, these districts are primarily re-

sponsible for enforcement, membership in MHSAA is voluntary, and local school districts often make and enforce rules that are more stringent than MHSAA rules. From Defendants' perspective, the relationship between school districts and the MHSAA is analogous to the relationship between adverse parties and an arbitrator. Defendants argue that the MHSAA simply provides member schools with a set of rules, which the member schools suggest and must formally adopt, so that a uniform set of rules can be obtained.

Essentially, Plaintiffs and Defendants disagree about what it means to "cede controlling authority." Plaintiffs assert that because the MHSAA makes the rules, it has controlling authority over interscholastic athletics—even though the local school districts must formally ratify those rules. Defendants argue that MHSAA cannot have controlling authority over interscholastic athletics because a school district is only bound by MHSAA rules if that school district formally adopts those rules.

To resolve this disagreement, the Court begins with a review of the MHSAA and its historic role in interscholastic athletics. In 1924, the MHSAA was founded to "exercise control over the interscholastic athletic activities of all schools of the state through agreement with the Superintendent of Public Instruction." 1978–90 MHSAA Handbook, Foreword. Prior to 1965, the Superintendent of Public Instruction was given supervision and control over interscholastic athletics by statute. *See* School Code of 1955, 1955 PA 269 § 784. Then, in 1965, this authority was transferred to the State Board of Education via statute. Mich. Comp. Laws § 388.1014. From 1924 through 1974 the MHSAA appears to have been part of the state government, assisting either the Superintendent of Public Instruction or the State Board of Education in regulating interscholastic athletics.

In 1972, the Michigan legislature transferred authority over interscholastic athletics from the State Board of Education to the local school boards. In addition to

transferring authority over interscholastic athletics in this manner, the Michigan legislature provided that:

> The [MHSAA] is the official association of the state for the purpose of organizing and conducting athletic events, contests, and tournaments among schools and shall be responsible for the adoption and enforcement of rules relative to eligibility of athletes in schools for participation in interschool athletic events, contests and tournaments.

*Id.* at § 380.1292(2). In addition to this "official designation," a representative of the State Board of Education was required to be a member of the MHSAA governing body. *Id.* at § 380.1292(1). In 1972, the MHSAA incorporated as a private association.

In 1995, the Michigan legislature again amended the statute. This time it removed MHSAA's official designation but explicitly provided that local school districts could "join organizations as part of performing the function of the school district." *Id.* at § 380.11a(4). While the MHSAA's public or private status may have changed throughout the years, its basic function appears to have remained the same since its inception in 1924—create rules and policies for the regulation of interscholastic athletics in the state of Michigan.

Against this historical backdrop, the Court's analysis of the extent to which the MHSAA currently exercises control over interscholastic athletics begins with a review of the "MHSAA Handbook For 1999–2000 School Year" (Handbook). The forward to the Handbook provides, "the Michigan High School Athletic Association, Inc. is a private, voluntary association of public, private and parochial secondary schools ... [i]t is not necessary for any school to join the MHSAA in order to conduct a program of competitive athletics, and MHSAA member schools are not prohibited from engaging in competition against non-member schools ... MHSAA is a self-supporting organization that does

not rely on taxpayer dollars from any agency of the state or federal government. Schools do not pay membership dues, tournament entry fees, or service fees. When schools host MHSAA events they are reimbursed their itemized expenses and usually generate additional income from concession and program sales, parking fees, and a portion of gate receipts...." Forward, MHSAA Constitution. The MHSAA Constitution goes on to provide that, "all high schools, junior high/middle schools, or other schools of Michigan ... may become members of this organization ...." Art. II, MHSAA Constitution. These provisions confirm Defendants' assertion that MHSAA is a private organization and that membership is purely voluntary. As such, these provisions go a long way in assuring the Court that the MHSAA does not exercise controlling authority over interscholastic athletics because the local schools can presumably disregard MHSAA rules, or exercise their option not to join the MHSAA, whenever they choose.

However, as the Court reads the MHSAA Handbook more closely, its initial assessment of the benign relationship between the MHSAA and local school districts is called into question. In the same forward that promises individual school districts that their membership in MHSAA is purely voluntary, MHSAA writes, " ... **schools adopt the Regulations and Interpretations of this Handbook as their own and agree to be primarily responsible for their enforcement.**" (emphasis in original). This warning is then reiterated by the MHSAA Constitution which provides,

[f]or a school to become a member of this organization, its board of education/governing body must complete the annual Membership Resolution stating that the board of education/governing body has adopted the organization's rules as its own and agrees to primary enforcement of such rules as to its own schools. Failure to implement required effects of policies and procedures promulgated by the organization to govern

eligibility, competition and tournaments shall require that members of the administration and board of education/governing · body appear before the [MHSAA] to show cause why the school is not in violation of the terms of its Membership Resolution.

Art. II, MHSAA Constitution. These provisions run contrary to the permissive and voluntary tone of the previously cited provisions and demand a closer examination of the relationship between the MHSAA and local school districts.

To uncover the precise nature of this relationship, it is necessary to examine the duties assigned to the Representative Council, the governing body of the MHSAA. The MHSAA Constitution provides:

Article VI —Duties of the Council

Sec. 1. The Council shall have general control of interscholastic athletic policies.

Sec. 2. It shall make rules of eligibility for players.

Sec. 3. It shall make regulations for the conduct of interscholastic contests.

Sec. 4. It shall be the annual responsibility of the Council to ascertain that the Council elective process has provided for representation of females and minorities. If, in the judgment of the Council, these results have not been achieved, said Council shall appoint not to exceed four Representative Council members-at-large for two-year terms.

Sec. 5. It may discipline member schools and contest officials for violations of rules and regulations

Sec. 6. It shall provide for the hearing of appeals from decisions of the Executive Director

Sec. 7. It shall exercise all other functions necessary for carrying out the spirit and purpose of the Constitution.

Art. VI, MHSAA Constitution. Not only is the Representative Council given broad authority to regulate interscholastic athletics, a separate Due Process Procedure provides a complex process which governs "the investigation into alleged or contested

violations by a party of the Constitution, By–Laws, regulations, rules, or interpretations of the MHSAA." The Regulations provide lengthy eligibility requirements, limitations on the number of games that may be played, specifications of what type of officials may be used, rules for playing MHSAA sports, practice and scrimmage schedules, limitations on the number of games in which an athlete may participate in a given week, day, month, etc, maximum number of competitions allowable in a given year, a list of sanctions for a wide variety of violations, and a calendar of MHSAA sponsored state tournaments. These Regulations cover 51 pages of the Handbook.

A comprehensive review of the Handbook undercuts Defendants' assertion that MHSAA has no real control over interscholastic athletics. Defendants may be correct, as a technical matter, that the local schools must formally adopt MHSAA rules and enforce MHSAA policies, but this does not necessarily mean that MHSAA does not have control over those rules or policies. There is only one interscholastic athletic association in the state of Michigan and that is the MHSAA. In a very real sense, the MHSAA has a de facto monopoly over interscholastic sports. This is evidenced by the fact that there is not a single high school in the state of Michigan, that is eligible for MHSAA membership, that is not a member. While local school districts may have the power to disregard

MHSAA rules or policies, and the legal authority to leave the Association altogether, these are not realistic options given the nature of interscholastic sports in Michigan. If a local school district were to disregard MHSAA rules, or leave the MHSAA, it would subject itself to MHSAA imposed sanctions (including possible expulsion), jeopardize its ability to compete in statewide tournaments, find it difficult to schedule opponents, and in general have problems providing interscholastic athletic programs to its students.

This explains why Defendants' reliance, on statements by the Michigan Attorney General and several state courts that interscholastic sports is a "non-delegable" duty of the local school districts, is misplaced. While the regulation of interscholastic athletics under Michigan state law is "non-delegable," the local school districts have delegated it to the Defendants. Having delegated this duty, the local school districts have now lost the power to control interscholastic athletics independent from the MHSAA.

The evidence presented reveals a genuine issue of material fact regarding the extent to which the MHSAA exerts control over interscholastic athletics. Thus, summary judgment must be denied.[3]

## II.  EQUAL PROTECTION AND 42 U.S.C. § 1983

Defendants also ask this Court to grant summary judgment in their favor with re-

---

**3.** The Court notes that the relief which the Plaintiffs seek cannot be obtained by suing the school districts directly. This is because the local school districts cannot unilaterally alter any policies of the MHSAA that are discriminatory. Assuming Plaintiffs allegations are true, the only way a local school districts could avoid whatever discrimination emanates from MHSAA policies would be to withdraw from the MHSAA. While this might end the discrimination, it would do so by depriving Plaintiffs of the ability to participate in interscholastic sports at all.

The Court believes that the potential inability to hold anyone accountable for alleged discrimination in a program receiving federal financial assistance is precisely why the ceding "controlling authority" is consistent with

the purpose of Title IX. Without liability for those who control federal programs, such as interscholastic athletics, victims of discrimination are placed in an untenable dilemma clearly at odds with the spirit, purpose, and language of Title IX. On the one hand, these victims may seek a remedy from the athletic association, but that association will respond that it only makes "suggestions" to the local school districts, and that the local school districts have the real power to adopt and enforce policies and rules. On the other hand, these victims might go to the local school districts to address their problems, but these districts will respond that they are powerless to change the policies of the MHSAA on their own, and that the MHSAA holds all the real power over interscholastic athletics.

spect to Plaintiffs' 42 U.S.C. § 1983 claim. Defendants argue that the MHSAA is not a state actor and therefore cannot be liable under § 1983. Plaintiffs respond that the symbiotic relationship between the state of Michigan and the MHSAA is so pronounced that the MHSAA should be considered a state actor.

■ In the Sixth Circuit, "the principal inquiry in determining whether a private party is a "state actor" is whether the party's actions may be 'fairly attributable to the state.' " *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir.1992) *citing Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The Supreme Court has created three tests to assist courts in making this determination. First, the public function test. *See West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Second, the state compulsion test. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Third, the symbiotic relationship or nexus test. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The Supreme Court has suggested that these tests may be simply "different ways of characterizing the necessarily fact-bound inquiry that confronts the Court [when resolving state actor questions]." *Lugar*, 457 U.S. at 939, 102 S.Ct. 2744.

■ The public function test asks whether "the private entity exercises powers which are traditionally exclusively reserved to the state, such as holding elections, or eminent domain." *Wolotsky*, 960 F.2d at 1335. Although the United States, as amicus, argues that interscholastic sports in Michigan is a public function, this position is contradicted by the Sixth Circuit's analysis in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 180 F.3d 758, 763 (6th Cir.1999). In that case, the Sixth Circuit concluded, based upon the Supreme Court's decision in *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 545, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987), that interscholastic sports is

not a power traditionally reserved to the state. *Id.* While this Court agrees with the United States that the State of Michigan has a long history of regulating interscholastic athletics (*see* I, B above), and that many of the cases and Michigan Attorney General opinions which Defendants cite indicate that interscholastic athletics is a "traditional government function," the Sixth Circuit's analysis in *Brentwood* is controlling.

■ The state compulsion test examines the extent to which the party seeking to establish state action can prove that the state so coerced or encouraged a private entity to act in a given way that the entity's action must be regarded as the choice of the state. *Wolotsky*, 960 F.2d at 1335. The Court believes that the MHSAA is a state actor pursuant to this test. The most persuasive argument supporting this conclusion is made by Defendants, albeit in the context of Title IX, where they argue that interscholastic athletics is a "non-delegable" duty of local school districts. According to Defendants, because all power over interscholastic athletics is held by the local districts, the MHSAA only acts at the will and direction of those districts. This characterization of the MHSAA-local school district relationship, added to the fact that the MHSAA is governed by a Representative Council comprised of primarily state employees (16 of the Representative Council members are public school employees and the Superintendent of Instruction is an ex-officio member), combines to make a strong case that the MHSAA is a state actor pursuant to the state compulsion test.

■ While satisfaction of the state compulsion test is reason enough to conclude that the MHSAA is a state actor, the Court is even more convinced by application of the symbiotic relationship test. As the Sixth Circuit explained, "under the symbiotic relationship or nexus test, the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so

that the action of the latter may be fairly treated as that of the state itself." *Wolotsky,* 960 F.2d at 1335.

There is no denying that there is a unique and close relationship between the MHSAA and the State of Michigan. Among other factors which define this relationship, the MHSAA is made up of primarily public schools,[4] public school employees are elected to serve on the Representative Council which oversees the MHSAA, school employees who desire to serve on the Representative Council must have approval from their principal or school district superintendent, the Michigan Superintendent of Public Instruction is an ex-officio member of the Representative Council, the MHSAA exercises tremendous influence and control over the rules and policies that regulate interscholastic athletics, MHSAA rules and policies are binding on all schools unless they withdraw from the MHSAA, and local school districts are primarily responsible for enforcing MHSAA rules and policies. Based upon similar factual circumstances linking state athletic associations to the state, a variety of Circuit Courts have found that these associations are state actors. *See Griffin High School v. Illinois High School Ass'n,* 822 F.2d 671, 674 (7th Cir.1987); *In Re Unit-*

ed *Sates ex. rel. Missouri State High School Activities Ass'n,* 682 F.2d 147, 151 (8th Cir.1982); *Clark v. Arizona Interscholastic Ass'n,* 695 F.2d 1126, 1128 (9th Cir.1982); *Moreland v. Western Pennsylvania Interscholastic Athletic League,* 572 F.2d 121, 125 (3rd Cir.1978); *Louisiana High School Athletic Ass'n v. St. Augustine High School,* 396 F.2d 224, 227 (5th Cir.1968); *Oklahoma High School Athletic Ass'n v. Bray,* 321 F.2d 269, 273 (10th Cir.1963). If this were the only precedent on the issue, the Court would be hard-pressed to justify any conclusion other than that the MHSAA is a state actor.[5] However, before the Court reaches this conclusion, there are two reported decisions which demand close attention.

In *Brentwood Academy v. Tennessee Secondary School Athletic Association,* 180 F.3d 758 (6th Cir.1999), the Sixth Circuit was asked to decide whether the Tennessee Secondary Athletic Association ("TSSAA") was a state actor when it enforced a rule against a private school, Brentwood Academy, that prohibited the school from using undue influence in recruiting student-athletes. The Sixth Circuit began by analyzing the structure and function of TSSAA which is strikingly similar to the MHSAA in this case.[6] The

---

4. In the 1998–1999 school year, the MHSAA was comprised of 617 public high schools and 114 private schools.

5. Defendants' argument that it is not a state actor, because it receives no state funds, is similar to its Title IX argument in that both ask the Court to exalt form over substance. The Supreme Court has repeatedly found, however, that when determining whether a private entity is a "state actor," courts should engage in a factual and pragmatic inquiry as opposed to an overly formalistic mode of analysis. *See Lugar,* 457 U.S. at 939, 102 S.Ct. 2744; *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (rejecting formalistic application of the Fifteenth Amendment and holding that Jaybird Political Party was a state actor on the grounds that the Jaybird primary had the practical effect of determining who would win the general election and the party was created for the sole purpose of avoiding the Fifteenth Amendment and discriminating against blacks); *Smith v.*

*Allwright,* 321 U.S. 649, 661, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (holding that Texas Democratic Party was subject to the Fourteenth Amendment as a state actor and rejecting as a "slight . . . change in form" defendants' argument that because the Democratic Party was a private entity it was not a state actor).

6. There are only minor differences between the TSSAA and the MHSAA. First, whereas the TSSAA had nine members on the governing board, the MHSAA has 18. Second, whereas all members of the TSSAA Control Board were public school employees during the relevant time period, 16 of the 18 members of the MHSAA Representative Council were public school employees. Third and finally, whereas the TSSAA was "designated" by the Tennessee Board of Education to conduct interscholastic athletics until 1995, the MHSAA was statutory authorized to oversee interscholastic athletics until 1995 at which time Michigan state law was amended.

Sixth Circuit noted that: (1) the TSSAA was a voluntary organization, that authorized member schools to withdraw at any time; (2) the TSSAA was made up of public and private schools; (3) a Board of Control, made up of nine members elected from member schools, decided TSSAA policy; (4) at all relevant times the Board of Control was comprised of public high school administrators; (5) the TSSAA receives no state funding; (6) the TSSAA's revenue was generated from gate receipts at state tournaments and the TSSAA negotiated contracts with member schools for the use of their facilities to house these tournaments; and (7) while a Tennessee Board of Education rule at one time designated the TSSAA to conduct interscholastic athletics, this rule was repealed in 1995.

With these facts in mind, the court examined prior Sixth Circuit precedent and concluded that Brentwood Academy had failed to satisfy any of the three tests for determining when a private entity should be considered a state actor. In reaching this conclusion, the Sixth Circuit examined several of its prior decisions that had held that a state athletic association was a state actor. *See Yellow Springs v. Ohio High School Athletic Association*, 647 F.2d 651 (6th Cir.1981); *Alerding v. Ohio High School Athletic Association*, 779 F.2d 315 (6th Cir.1985). The Sixth Circuit concluded that these decisions were not controlling. *Brentwood Academy*, 180 F.3d at 764–766.

Additionally, the Sixth Circuit examined the extent to which a finding that TSSAA was not a state actor was consistent with Footnote 13 of the Supreme Court's decision in *NCAA v. Tarkanian*, 488 U.S. 179, 193 n. 13, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). The Sixth Circuit explained that while *Tarkanian* Footnote 13 indicated that high school athletic associations might potentially be state actors in relation to public schools, the same footnote indicates that "even if an athletic association is a state actor when dealing with a public school, it 'was not acting under color of state law in its relationships with private universities.'" *Brentwood Academy*, 180

F.3d at 766 *citing Tarkanian*, 488 U.S. at 193 n. 13, 109 S.Ct. 454. Therefore, the Sixth Circuit concluded that because Brentwood Academy was a private school, Footnote 13 did not require a finding that the TSSAA was a state actor. *Brentwood Academy*, 180 F.3d at 766.

This analysis misapplies the reasoning in *Tarkanian*. In *Tarkanian*, the Supreme Court was asked to decide whether the National Collegiate Athletic Association ("NCAA") was acting under color of state law when it conducted an investigation into athletic programs at the University of Nevada Las Vegas ("UNLV") and recommended to UNLV that it discipline its mens basketball coach, Jerry Tarkanian. In a 5–4 decision, the Supreme Court concluded that the NCAA was not a state actor.

The central issue in the case was whether the NCAA's recommendations, and UNLV's adverse employment actions, were so coordinated that they should be considered "joint actions" such that the NCAA was a state actor. *Tarkanian*, 488 U.S. at 194–199, 109 S.Ct. 454. Before analyzing this "joint action" issue, however, the majority opinion briefly examined whether UNLV exercised such control over the NCAA that all NCAA policies and actions were transformed into state actions. *Id.* at 193, 109 S.Ct. 454. The majority observed that the NCAA was made up of colleges and universities from all across the country, and that UNLV had no more influence over the NCAA than other schools. *Id.* Therefore, because these colleges and universities outside of Nevada were not acting under color of Nevada state law, the NCAA's decisions and policies could not possibly be considered to be those of the state of Nevada. *Id.*

At this point, the majority inserted Footnote 13. *Id.* at 193 n. 13, 109 S.Ct. 454. The first sentence of the Footnote points out that the majority's analysis would be quite different in cases where an association's membership consisted entire-

ly of schools from the same state, many of which were public institutions. *Id.* The majority then cited two circuit court decisions which found that state athletic associations were state actors. *Id.* In the second sentence of the Footnote, the majority notes that the dissenters accept the proposition that the NCAA is not a state actor when it takes "joint action" with a private university, and that the majority of the NCAA's membership is private schools. *Id.* The inference to be drawn from this second sentence is that because the dissenters accept the idea that "joint action" between the NCAA and a private university would not transform NCAA action into state action, and because the NCAA is made up of primarily private universities, the NCAA cannot be considered a state actor based upon its membership. The majority is using the dissents "joint action" analysis to reinforce its own conclusion that the NCAA cannot possibly be a state actor because of its membership.

The *Tarkanian* case required the Supreme Court to examine two independent state actor questions. First, the Supreme Court was required to briefly analyze in what instances an athletic association might be considered a state actor because its members controlled the association and those members were state actors. ("The membership question"). Second, the Supreme Court examined in what instances an athletic association should be considered a state actor when it engages in joint activity with the state. ("The joint action question"). With these independent inquiries in mind, Footnote 13 appears to stand for three propositions. First, an athletic association made up of schools from across the country, the majority of which are private schools, is not a state actor because no one state controls the policy of the association. Second, if an association were made up of schools from the same state, and the majority of those schools were public, the association might well be a state actor. Third, while "joint action" between a public school and a private association might render the private association a state actor, joint action between a

private school and a private association would not.

The Sixth Circuit's opinion in *Brentwood Academy* misstates the Supreme Court's reasoning in *Tarkanian*. The Sixth Circuit explained that the TSSAA was not a state actor, in part, because "all nine justices agree that even if an athletic association is a state actor when dealing with a public school, it 'was not acting under color of state law in its relationship with private universities.'" *Brentwood Academy*, 180 F.3d at 766 *citing Tarkanian*, 488 U.S. at 193 n. 13, 109 S.Ct. 454. The problem with this analysis, however, is that this quoted line from Footnote 13 applies to the joint action question, not the membership question at issue in *Brentwood Academy*. In *Brentwood Academy*, the issue was not whether "joint action" between the TSSAA and Brentwood Academy transformed the TSSAA into a state actor, it was whether the TSSAA was a state actor because its members were primarily public schools, it was historically recognized by the state of Tennessee, and its Board was dominated by public school employees. As a result, there appears to be a serious disconnect between *Tarkanian* and the Sixth Circuit's reasoning in *Brentwood Academy*.

In the end, the Court concludes that the MHSAA is a state actor. The Court reaches this conclusion for four primary reasons. First, the actions of the MHSAA may be "fairly attributed to the state" as evidenced by the fact that under the state compulsion test or the symbiotic relationship test, the MHSAA is a state actor. Second, the vast majority of circuit courts to consider this issue have concluded that state athletic associations such as the MHSAA are state actors. Third, the *Brentwood Academy* decision is not controlling in this case because (a) it cannot be reconciled with Footnote 13 in *Tarkanian*, and (b) by its own terms its analysis is limited to a unique factual situation—a private school alleging that a state athletic association is a state actor when it regulates that private school—not present

here. Fourth, Footnote 13 of the *Tarkanian* decision indicates that the Supreme Court believes that state athletic associations, such as the MHSAA, are state actors. Therefore, the Equal Protection Clause claim survives Defendants' Motion for Summary Judgment and Motion to Dismiss.

## III. Standing

■ Plaintiffs bear the burden of demonstrating standing. "To establish Article III standing to sue in federal court, an individual plaintiff must show that (1) he or she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury will likely be redressed by a favorable decision." *American Federation of Government Employees v. Clinton*, 180 F.3d 727, 732 (6th Cir.1999) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

■ Organizations have standing to assert claims on behalf of members provided that three additional requirements are met. These requirements are "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organizations' purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see also American Federation*, 180 F.3d at 732.

In the context of a summary judgment motion, provided that there is sufficient evidence to create a genuine issue of material fact as to standing, the motion should be denied. *See Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Kardules v. City of Columbus*, 95 F.3d 1335, 1346 (6th Cir.1996). The Court has previously examined standing issues in relation to Defendants' Motion to Dismiss. In the Opinion and Order which resolved that Motion, the Court held that Plaintiffs had presented enough evidence to survive the Motion to Dismiss. (Dkt. Nos. 44 and 45.) Although Defendants have offered subsequent evidence and argument which undermines the credibility of Plaintiffs' position on the standing issue, the Court remains convinced that there are genuine issues of material fact still in controversy. Therefore, for the reasons stated here and the Court's prior rulings, Defendants' Motion for Summary Judgement for Lack of Standing is denied.

## IV. Liability for Individual Defendants

■ The Court has previously considered whether the individual Defendants may be sued in their official capacity. (Opinion and Order Dkt. Nos. 44 and 45.) Individuals who exercise administrative control over an entity which is subject to Title IX liability may be sued in their official capacity. *See generally Smith v. Metro. Sch. Dist.*, 128 F.3d 1014, 1020 (7th Cir.1997). This is because official capacity suits represent another way of pleading an action against the entity represented by the individuals. *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). In this case, there is no question that the MHSAA Representative Council has control over the MHSAA. Therefore, to the extent that the MHSAA is a viable Title IX defendant, so to are the members of the MHSAA Representative Council. As such, summary judgment is denied.

## Conclusion

In 1924, the MHSAA was created by the State of Michigan to regulate interscholastic athletics. Coincident to the passage of Title IX, the MHSAA incorporated itself to operate as a private association, although its functions remained largely the same. Then, in 1995, after the Sixth Circuit's decision in *Horner*, the State of Michigan removed the "official designation" of the MHSAA, though its membership and function again remained unchanged. Since then, the MHSAA has continued to exer-

cise de facto control over interscholastic athletic programs in the state of Michigan.

The various formulations of the MHSAA appear to have been motivated by a desire to avoid the requirements of Title IX and the Equal Protection Clause, not to alter its mission or purpose. Since resolution of Defendants' motions require that this Court not exalt form over substance, and instead inquire into the real and substantial legal acts of the Defendants, their arguments cannot prevail.